**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Senterra, Ltd. v. Winland*, **Slip Opinion No. 2022-Ohio-2521.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2521

SENTERRA, LIMITED, APPELLEE AND CROSS-APPELLANT, *v.* WINLAND ET AL., APPELLANTS AND CROSS-APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Senterra, Ltd. v. Winland*, Slip Opinion No. 2022-Ohio-2521.]**

*Property law—Marketable Title Act, R.C. 5301.47 et seq.—Oil and gas—Court of appeals' judgment affirmed.*

(No. 2020-0197—Submitted October 5, 2021—Decided July 26, 2022.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Belmont County, No. 18 BE 0051, 2019-Ohio-4387 and 2019-Ohio-5458.

_____

STEWART, J.

{¶ 1} In this discretionary appeal from a judgment of the Seventh District Court of Appeals, we are asked to determine the ownership rights to an oil and gas interest that has been severed from its surface property.  Appellee and cross-appellant, Senterra, Ltd., the owner of the surface property at issue, seeks to quiet title to the disputed oil and gas interest in its favor and urges us to apply the deed-

interpretation rule of equity set forth in *Duhig v. Peavy-Moore Lumber Co.*, 135 Tex. 503, 507-508, 144 S.W.2d 878 (1940) (the "*Duhig* rule"), which estops a grantor from claiming title to a severed oil and gas interest when doing so would breach the grantor's warranty as to the title and interest purportedly conveyed to the grantee. Appellants and cross-appellees,[1] the heirs to the oil and gas interest ("the heirs"), argue that the *Duhig* rule is inapplicable and that Ohio's Marketable Title Act ("MTA"), R.C. 5301.47 et seq., applies to the interest and gives them marketable record title to it.

**{¶ 2}** We decline Senterra's invitation to apply the *Duhig* rule, as it is inapplicable to the facts of this case. Moreover, there is an unbroken chain of record title to the oil and gas interest at issue for at least 40 years following the root-of-title deed to the property. *See* R.C. 5301.48. The MTA thus applies and preserved the heirs' oil and gas interest. Accordingly, we affirm the judgment of the Seventh District.

**Facts and Procedural History**

**{¶ 3}** In 2012, Senterra acquired a 77.5-acre parcel of land in Belmont County through a general warranty deed.[2] The conveyance was subject to oil and gas interests that were severed from the surface property prior to Senterra's acquisition of the land. For the purposes of this case, the genesis of transfers of the land occurred in 1925 when Lulu E. and James H. Winland and Alta H. and William H. Dermot (collectively, "Winland-Dermot") conveyed their interest in an 86-acre

---

1. Appellants and cross-appellees are Alan T. Winland, Laura J. Winland, Linda Godek, Clarence Winland, Frances Faulkner, Norman Winland, Teresa Winland, John D. McBrayer, Brenda S. Langkopf, Amy Kay Fahner, Jeff Fahner, Lori Jo Podsobinski, Charles Patterson, Cathy Patterson, Debra Saunders, Bill Saunders, Diane McBrayer Andersen, Brian Andersen, Linda Dollison, and Larry Podsobinski. On August 21, 2020, counsel for appellants and cross-appellees filed suggestions of death notifying this court that Alant T. Winland died on May 19, 2020, and that Clarence Winland died on December 22, 2018.

2. Senterra acquired through the same transfer a second parcel of land that is not at issue in this appeal.

tract of land to Joseph E. Russell and George W. Russell through a quit-claim deed. In the deed, Winland-Dermot "except[ed] and reserve[d]" a one-quarter interest in the oil and gas underlying the land.

{¶ 4} In 1941, Joseph Russell and George Russell transferred their interest in the 86-acre tract to George Russell through a warranty deed but excepted from the transfer "all oil and gas rights." The deed did not mention the one-quarter exception and reservation made by Winland-Dermot in 1925. In 1954, George Russell transferred the 86-acre tract to Stanley Juzwiak and Margaret Juzwiak through a warranty deed but excepted and reserved a one-quarter interest in the oil and gas for himself and his heirs and assigns. The 1954 deed did not mention the prior exceptions or reservations contained in the 1925 and 1941 deeds.

{¶ 5} In 1971, Stanley Juzwiak and Margaret Juzwiak transferred their interest in the remainder of the land, then 77.5 acres, to Seaway Coal Company through a warranty deed that restated George Russell's exception and reservation of a one-quarter interest in the oil and gas. In 1987, Seaway Coal Company transferred its interest to Shell Mining Company through a general warranty deed that again restated George Russell's 1954 exception and reservation of the one-quarter interest. In 1992, Shell Mining Company transferred its interest to R & F Coal Company through a limited warranty deed. The deed stated that the transfer was "subject to * * * conditions and restrictions of record," and attached to the deed was the 1987 deed for the transfer of the land from Seaway Coal Company to Shell Mining Company.

{¶ 6} In 2000, Capstone Holding Company, a successor by merger to R & F Coal Company, transferred its interest to Lora Lynn Kelly, David Joseph Sensius, and Steven George Sensius through a limited warranty deed. Although the deed did not refer to any specific prior exceptions or reservations, it contained the following language: "UNDER and SUBJECT to any and all exceptions, reservations, restrictions, * * * [and] covenants and conditions * * * shown by

instruments of record." (Capitalization sic.) In 2012, Lora Kelly, David Sensius, and Steven Sensius conveyed their interest to Senterra through a warranty deed. The deed referred to the 1992 deed for the transfer of the land from Shell Mining Company to R & F Coal Company, and it contained language regarding prior exceptions and reservations identical to that used in the 2000 deed.

{¶ 7} In 2018, Senterra filed a complaint in the Belmont County Court of Common pleas against the heirs and other defendants,[3] seeking to quiet title to the interests in the oil and gas underlying the land. Senterra filed a motion for summary judgment, arguing among other things that the oil and gas interests retained under the 1925 and 1941 conveyances were extinguished by the MTA and that George Russell's purported reservation of a one-quarter interest in the oil and gas in the 1954 deed was legally ineffective under the *Duhig* rule. Alternatively, Senterra argued that the oil and gas interests were abandoned under Ohio's Dormant Mineral Act, R.C. 5301.56.

{¶ 8} The trial court granted summary judgment to Senterra regarding title to the interest that had been retained by George Russell, determining that the reservation made in the 1954 deed was void ab initio under the ordinary rules of contract construction and the *Duhig* rule. The court also determined that the reservations of the oil and gas interests made in 1925 and 1941 were extinguished by the MTA and that Senterra possessed marketable record title to the oil and gas interests. The court then determined that Senterra's claims based on the DMA were moot.

{¶ 9} The heirs appealed to the Seventh District, arguing that the trial court erred when it applied the MTA to extinguish their oil and gas interests, that it incorrectly determined that the interests were extinguished by the MTA even if the MTA applied, and that it erred when it determined that George Russell's reservation

---

3. Senterra's complaint also named as defendants Rice Drilling D, L.L.C., and Gulfport Energy Corporation, neither of which are involved in this appeal.

of the one-quarter interest in the oil and gas was void ab initio pursuant to the *Duhig* rule. 2019-Ohio-4387, 148 N.E.3d 34, ¶ 34, 48-49, 84-85. The court of appeals affirmed the trial court's determinations that the MTA applied and extinguished the oil and gas interests that had been retained in the 1925 and 1941 deeds, *id.* at ¶ 43-44, 68-74, but it reversed the trial court's determination that George Russell's reservation of the one-quarter interest was void ab initio, *id.* at ¶ 94, 96. The court of appeals held that the *Duhig* rule was inapplicable to that reservation and that the MTA applied and preserved the one-quarter interest in the oil and gas. *Id.*

{¶ 10} Senterra filed an application for reconsideration with the court of appeals, requesting that it grant a limited remand to the trial court based on the court of appeals' determination that the trial court had erroneously applied the *Duhig* rule when it should have determined that the interest was preserved under the MTA. 2019-Ohio-5458, ¶ 4. Senterra asserted that the court of appeals' holding revived its claim that the interest had been abandoned under the DMA. *Id.* The court of appeals granted the application and remanded the matter to the trial court for it to determine whether the interest had been abandoned under the DMA. *Id.* at ¶ 6-8.

{¶ 11} The heirs appealed to this court, and Senterra filed a cross-appeal. We accepted jurisdiction to consider the heirs' first proposition of law: "The Dormant Mineral Act, R.C. 5301.56, is the specific provision of the Marketable Title Act, R.C. 5301.47 et seq., with respect to the transfer of severed, fee oil and gas ownership interests to a surface owner and its provisions prevail over the general provisions which are inapplicable." *See* 158 Ohio St.3d 1522, 2020-Ohio-3018, 145 N.E.3d 311. We also accepted jurisdiction to consider Senterra's sole proposition of law: "When a reservation fails under the *Duhig* Rule, it is declared void ab initio at the time of the deed and cannot be revived pursuant to later determinations that prior reservations were made or deemed ineffective pursuant to statutory mechanisms." *See id.*

**{¶ 12}** We held the appeal and cross-appeal for our decision in *West v. Bode*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298. *See* 158 Ohio St.3d 1522, 2020-Ohio-3018, 145 N.E.3d 311. After *West* was decided, we lifted the stay and ordered briefing on the proposition of law presented in Senterra's cross-appeal only, 160 Ohio St.3d 1514, 2020-Ohio-6834, 159 N.E.3d 1178, because we addressed the arguments relating to the heirs' proposition of law in *West*, holding that there is no irreconcilable conflict between the MTA and the DMA, *see West* at ¶ 2.

## Law and Analysis

**{¶ 13}** As an initial matter, we decide the issue presented in the heirs' proposition of law in accordance with our decision in *West* and affirm the judgment of the court of appeals on that issue.

**{¶ 14}** Turning to the proposition of law presented in Senterra's cross-appeal, we note that when the MTA was originally enacted in 1961, it did not apply to mineral interests. *West* at ¶ 17, citing former R.C. 5301.53(E), 129 Ohio Laws 1040, 1046. The General Assembly amended the MTA in 1976, however, to allow property owners to clear their properties' titles of unused mineral interests. *Id*.; *see also* Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. "The [MTA now] extinguishe[s] oil and gas rights by operation of law after 40 years from the effective date of the root of title unless a saving event preserving the interest appear[s] in the record chain of title." *Corban v. Chesapeake Exploration, L.L.C*., 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, ¶ 18 (lead opinion); *see also Collins v. Moran*, 7th Dist. Mahoning No. 02 CA 218, 2004-Ohio-1381, ¶ 20 (explaining that the MTA operates "as a 40-year statute of limitations for bringing claims against a title of record").

**{¶ 15}** "Ohio's [MTA] is taken primarily from the Model Marketable Title Act." *Heifner v. Bradford*, 4 Ohio St.3d 49, 51, 446 N.E.2d 440 (1983). The MTA provides that a person who has an unbroken chain of title of record to any interest

in land for at least 40 years has a "marketable record title" to that interest. R.C. 5301.48; *see also West*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298, at ¶ 15. Marketable record title is a title of record that extinguishes interests and claims existing prior to the date of the root of title. R.C. 5301.47(A). " 'Root of title' means that conveyance or other title transaction in the chain of title of a person, purporting to create the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined." R.C. 5301.47(E). Thus, the root of title must precede the date when marketability is being determined by 40 years and it must account for the interest claimed by the person seeking marketable record title. *Id.*; *see also Blackstone v. Moore*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, ¶ 9. The court of appeals explained the process for determining the root of title under the MTA:

> "Assuming the Model Act were enacted as written, an examiner inspecting title would use it as follows: beginning with the date forty years before the date on which he is determining title and moving chronologically backwards therefrom, he would find the most recently recorded conveyance of the subject parcel. This document is his potential root of title. After giving a cursory examination of the previous title documents to determine easements, interest owned by the federal government, and reversionary, possessory interests in leases, he would closely scrutinize the documents in the chain of title for the forty years immediately following the root. Finding no competing recorded interests, he could safely assume that all interests previous to the root of title not otherwise excepted were extinguished and that the title was defect free up to the date of the root. If, however, he found competing

claims in the chain, he would go back to the next closest preceding conveyance and repeat the process. He would continue moving back until he found a conveyance followed by forty years of clean title. That document would be his root, and he could safely conclude that the act extinguished all competing interests recorded prior to that date."

2019-Ohio-4387, 148 N.E.3d 34, at ¶ 57, quoting Hubbert, *Rocked by* Rocket*: Applying Oklahoma's MRTA to Severed Mineral Interests after* Rocket v. Donabar, 68 Okla.L.Rev. 381, 386 (2016).

**{¶ 16}** Further, "[a]n interest that has been extinguished by operation of the [MTA] cannot be revived." *West* at ¶ 15, citing R.C. 5301.49(D). The only exception to that rule is if there was a saving event that appears in the record chain of title— "i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest '[arose] out of a title transaction which has been recorded subsequent to the effective date of the root of title.' " (Brackets added in *Corban*.) *Corban*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, at ¶ 18, quoting R.C. 5301.49(D).

**{¶ 17}** Relying on the Seventh District's application of the *Duhig* rule in *Talbot v. Ward*, 2017-Ohio-9213, 102 N.E.3d 544 (7th Dist.), the trial court determined that George Russell's reservation of the one-quarter oil and gas interest was void ab initio. In *Talbot*, the Seventh District analyzed successive recorded transfers of a property's oil and gas interests that occurred within a 40-year period. *Id.* at ¶ 2-13. The court of appeals neither mentioned nor applied the MTA in *Talbot*. Rather, in determining the ownership of the interests at issue, the court applied the *Duhig* rule. *Talbot* at ¶ 45-74.

8

**{¶ 18}** The origin of the transfers of the disputed oil and gas interests at issue in *Talbot* occurred in 1943, when a grantor conveyed his surface property to a grantee but excepted and reserved a one-half interest in the oil and gas underlying the property while failing to adequately mention any prior exceptions or reservations regarding that interest in the deed. *Id.* at ¶ 45-51. The other one-half interest in the oil and gas was owned by a third party who subsequently sold that interest. *Id.* at ¶ 64-65. The grantee later sold his one-half interest to the third party's successor in title who by then owned the other one-half interest. *Id.* at ¶ 7, 61. And in 1977, the third-party successor recorded a preservation affidavit claiming ownership of the entire oil and gas interest. *Id.* at ¶ 40, 61.

**{¶ 19}** The appellees in *Talbot* argued that the original grantor had retained the one-half interest that he excepted and reserved to himself. *Id.* at ¶ 53. But the court of appeals held that under the *Duhig* rule and the ordinary rules of deed construction, even if the original grantor had excepted or reserved the one-half interest, that exception or reservation failed because the original grantor violated the warranty of title and his successors in interest were estopped from claiming title to the reserved fractional interest. *Talbot* at ¶ 68.

**{¶ 20}** The Seventh District distinguished *Talbot* from this case because *Talbot* did not involve an unbroken chain of title of record for 40 years, which is necessary for the MTA to apply. 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 91-92. The court of appeals noted, "In *Talbot* we were not asked to apply the MTA. Given the facts [in *Talbot*], the MTA could not have been used to extinguish an interest; the MTA could not remove the clouds on the title to the minerals because there were competing interests that were preserved within the 40 year period." *Id*. at ¶ 91. We agree with the court of appeals that the *Duhig* rule does not apply to the facts of this case. *See Trial v. Dragon*, 593 S.W.3d 313, 319 (Tex.2019) (determining that the *Duhig* rule applies only "if the grantor owns the exact interest to remedy the breach

*at the time of execution* and equity otherwise demands it" [emphasis sic]).  Rather, this matter is resolved solely by the MTA.

**{¶ 21}** In 1925, Winland-Dermot excepted and reserved a one-quarter interest in the oil and gas.  Accordingly, Joseph Russell and George Russell could each retain at most a three-eighth interest in the oil and gas under the 1941 deed (one-half each of the remaining three-quarter interest).  However, in 1954, George Russell excepted and reserved for himself and his heirs and assigns a one-quarter interest in the oil and gas and, because he did not account for the prior exceptions or reservations contained in the 1925 and 1941 deeds, the plain language of the 1954 deed indicated that he conveyed the surface property and a three-quarter oil and gas interest to Stanley Juzwiak and Margaret Juzwiak.  Because of the exception and reservation made by Winland-Dermot in the 1925 deed and the exception made by Joseph Russell in the 1941 deed, George Russell owned only a three-eighth interest in the oil and gas; but he purported to convey a three-quarter interest.

**{¶ 22}** Senterra argues that under the *Duhig* rule, since George Russell conveyed to Stanley Juzwiak and Margaret Juzwiak an interest in the property that was greater than what he had owned, his attempt to retain the oil and gas interest failed and should be declared void at the time of the 1954 deed.  The flaw in that argument, however, is that George Russell did not own the exact interest necessary to remedy the breach at the time of the conveyance: he excepted and reserved a one-quarter interest when he held only a three-eighth interest.  Therefore, forfeiting his one-quarter interest in favor of Stanley Juzwiak and Margaret Juzwiak would not remedy the alleged breach, as it would not provide the Juzwiaks with their three-quarter interest.

**{¶ 23}** Similarly, the dissenting opinion incorrectly frames the *Duhig* rule as standing for the proposition that a grantor's overconveyance at the time of executing the deed renders the grantor's exception or reservation under the deed

void ab initio. However, the *Duhig* rule embodies a narrow, equitable principle that, as noted above, does not apply here. *See Dragon*, 593 S.W.3d at 318 (emphasizing that "*Duhig* applies the doctrine of estoppel by deed to a very distinct fact pattern, and its holding is narrow and confined to those specific facts"). Further, Senterra does not direct this court's attention to any Ohio authority that stands for the proposition that a grantor's exception or reservation is *void* at the time of the deed's execution when the grantor also purports to convey more than he owns.

{¶ 24} Moreover, Senterra's position ignores the applicability of the MTA here and its purpose, which is to " ' "simplify[] and facilitat[e] land title transactions by allowing persons to rely on a record chain of title." ' " *West*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298, at ¶ 15, quoting *Corban*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, at ¶ 17, quoting R.C. 5301.55. Senterra wants us to disregard the more than 40-year unbroken chain of record title that preserved George Russell's one-quarter oil and gas interest under the MTA and yet scrutinize the 1954 deed as if the interests retained in the 1925 and 1941 deeds were not extinguished by the MTA.

{¶ 25} Although the extinguishment of the exceptions or reservations contained in the 1925 and 1941 deeds is not at issue here due to our decision in *West*, the lower courts' determinations regarding the extinguishment of those interests are important to our analysis. The trial court determined that the Winland-Dermot reservation was extinguished because the root-of-title deed was the 1954 deed, there was no reference to the interest in the chain of record title following the 1925 deed that created the interest, and there was no saving event under R.C. 5301.49 that preserved the interest. The court of appeals affirmed the trial court's determination that Senterra and its predecessors in title had an unbroken chain of record title to the interest for more than 40 years. 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 68.

**{¶ 26}** Similarly, the trial court determined that the exception made by Joseph Russell and George Russell in 1941 was extinguished because the root-of-title deed was the 1971 deed (a determination to which the parties had stipulated), there was no reference to the interest in the chain of record title following the 1941 deed that created the interest, and there was no saving event under R.C. 5301.49 that preserved the interest. The court of appeals affirmed the trial court's determination that Senterra and its predecessors in title had an unbroken chain of record title to the interest for more than 40 years. 2019-Ohio-4387 at ¶ 73. The court explained that even though Joseph Russell and George Russell had each retained a three-eighth interest in the oil and gas under the 1941 deed, the language of the 1971 root-of-title deed accounted for only George Russell's one-quarter interest. *Id.* Accordingly, the court determined that the remaining one-half interest—Joseph Russell's three-eighth interest plus George Russell's remaining one-eighth interest—was extinguished. *Id.*

**{¶ 27}** The significance of the extinguishment of those interests is that there were no recorded, competing interests to George Russell's exception and reservation of the one-quarter oil and gas interest created in the 1954 deed. The 1971 root-of-title deed specifically referred to George Russell's exception and reservation of the one-quarter interest. The exception-and-reservation language was repeated in the 1987 deed, and the 1992 deed referred to the 1987 deed by the county recorder's volume and page number. Although the MTA extinguished the exceptions or reservations made in the 1925 and 1941 deeds, it did not extinguish the exception and reservation of the interest made by George Russell.

**{¶ 28}** Senterra urges us to apply the *Duhig* rule and to consider the state of title to a property at the time that the conveyance of the property occurred, even when the conveyance preceded the root-of-title deed, and to recognize interests that were not preserved in the chain of record title or subject to any saving event under the MTA. But an interest that has been extinguished by the MTA may not be

revived. *West*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298, at ¶ 15, citing R.C. 5301.49(D). Had Winland-Dermot or Joseph Russell properly retained their interests or challenged the 1954 conveyance before their interests were extinguished, the outcome of this case might be different. But the exception and reservation of that interest was not challenged until 2018 when Senterra filed its quiet-title complaint, which was more than 40 years after the root-of-title event—the 1971 deed that restated George Russell's exception and reservation regarding the one-quarter oil and gas interest.

{¶ 29} The dissenting opinion ignores the fact that both the trial court and the court of appeals determined that the MTA extinguished the interest sought to be retained by Winland-Dermot in 1925 and the interest sought to be retained by Joseph Russell and George Russell in 1941, 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 43-44, 68-74. The dissenting opinion unilaterally determines that the 1925 conveyance is a better root of title for George Russell's one-quarter-interest exception and reservation, finding that "[a] title search conducted using the 1925 conveyance as the root of title—and going forward 40 years—would demonstrate that George Russell's purported 1954 exception was void." Dissenting opinion, ¶ 70. However, there is no basis on which to conclude that the 1925 conveyance is the root of title because, as the court of appeals correctly acknowledged, Senterra is the party seeking to quiet title, the 1971 deed accounts for the interest for which Senterra seeks marketable record title, *see Blackstone*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, at ¶ 9, and the 1971 deed is the most recently recorded deed during the 40-year period prior to the time when marketability was being determined, which was 2018, that accounts for the interest. *See* R.C. 5301.47(E). Moreover, the dissenting opinion's cherry-picking a new root of title to support its pseudo-MTA analysis does not resuscitate the interest sought to be retained by Wilmot-Dermot or the interest sought to be retained by Joseph Russell and George Russell, and it is nonsensical to acknowledge that those interests were extinguished

by the MTA while also concluding that George Russell conveyed in the 1954 deed more than he owned, thus voiding his interest. This court is not, as the dissenting opinion suggests, validating George Russell's "defunct" one-quarter-interest exception and reservation through application of the MTA. Dissenting opinion at ¶ 64. Rather, we merely disagree with the dissenting opinion and Senterra that George Russell's one-quarter-interest exception and reservation was void at the outset. As such, we hold that George Russell and his heirs and assigns have marketable record title under the MTA to the one-quarter oil and gas interest at issue.

**Conclusion**

{¶ 30} We affirm the judgment of the Seventh District Court of Appeals and hold that the one-quarter oil and gas interest retained by George Russell and his heirs and assigns was not subject to the *Duhig* rule and that the heirs' interest was preserved under the MTA. In accordance with the judgment of the court of appeals, the cause is remanded to the trial court for it to determine whether the interest was abandoned under the DMA.

Judgment affirmed.

O'CONNOR, C.J., and DONNELLY and BRUNNER, JJ., concur.

DEWINE, J., dissents, with an opinion joined by KENNEDY and FISCHER, JJ.

_____

**DEWINE, J., dissenting.**

{¶ 31} This case concerns the ownership of oil and gas located under a tract of land in Belmont County. The facts are somewhat complicated, but the question before us is simple: What happens when a landowner attempts to convey a fractional property interest and at the same time retain a fractional property interest for himself, but he doesn't own enough of the property to do both? Under settled property-law principles, the answer is that the landowner's attempt to retain the

interest fails. And that makes sense: if I have three apples, and I give three apples away, I can't keep one for myself. The majority, though, applies Ohio's Marketable Title Act, R.C. 5301.47 et seq., to achieve a contrary result. Properly understood, however, the MTA does not sustain the majority's holding. Respectfully, I dissent.

## I. BACKGROUND

{¶ 32} Senterra, Ltd., owns the surface of the tract of land in question. This dispute is about the mineral rights. Does Senterra own all the mineral rights, or do the heirs of George Russell own a portion of those rights? To answer this question, we need to go back in time.

{¶ 33} Nearly a century ago, two families, the Winlands and the Dermots, collectively owned the property. In 1925, the Winland-Dermot families conveyed their complete interest to Joseph and George Russell, except that, relevant here, they retained a $^1/_4$ share of the oil and gas interest ("the mineral interest"). After that conveyance, the Russells collectively owned the property, save for the Winland-Dermot $^1/_4$ mineral-interest share.

{¶ 34} In 1941, Joseph Russell conveyed the surface estate to George. But the Russells both retained their mineral interest in the property. This meant that they each owned a $^3/_8$ share of the mineral interest.

{¶ 35} Things get messy in 1954. That year, George Russell sold the surface of the property to the Juzwiaks. He also conveyed by warranty deed some of his mineral interest. The deed language conveyed all the property, "excepting and reserving to George W. Russell, his heirs and assigns, one-fourth ($^1/_4$) of all oil and gas in and underlying the above described property."[4] (Capitalization deleted.)

---

4. The majority and the lower courts refer to the interest that George Russell purported to retain for himself as a "reservation." But as I explain below, it is more accurate to refer to it as an "exception," because its purpose was to exclude from the conveyance mineral rights that were already in existence. *See Peppertree Farms, L.L.C. v. Thonen*, 167 Ohio St.3d 52, 2022-Ohio-395, 188 N.E.3d 1061, ¶ 18. Thus, this dissent will refer to the interest that George Russell purported to "except[] and reserv[e]" for himself in 1954 as an "exception."

Thus, George Russell purported to convey to the Juzwiaks a $^3/_4$ share of the mineral interest while retaining the final $^1/_4$ share. But remember, *George Russell's share of the mineral interest was just $^3/_8$.* So he purported to convey twice the mineral interest that he owned and still retain an interest for himself.

{¶ 36} To recap, following the 1954 conveyance, the Juzwiaks owned the surface estate and claimed a $^6/_8$-share mineral interest, and George Russell claimed a $^2/_8$-share mineral interest. Meanwhile, consistent with the chain of title, Joseph Russell claimed a $^3/_8$ share of the mineral interest (under the 1941 conveyance), and the Winland-Dermot families claimed a $^2/_8$-share mineral interest (under the 1925 conveyance). That's too many slices for one pie ($^{13}/_8$)—in other words, some interest holders had competing claims to the same minerals. This quandary gives rise to the present dispute. But it is necessary to continue through the property's transfer history.

{¶ 37} The Juzwiak interest subsequently changed owners five times, culminating with Senterra's purchase in 2012. Intervening transfers occurred in 1971, 1987, 1992, and 2000. Each successive conveyance of the Juzwiak interest up to, eventually, Senterra's purchase, noted the 1954 George Russell exception but not the original Winland-Dermot or Joseph Russell reservations or exceptions. In 2012, Senterra purchased all 86 surface acres of the property and the Juzwiaks's portion of the mineral rights.

{¶ 38} Until that point, the interest holders had never litigated the effect of George Russell's 1954 overconveyance. For a while, mineral interests in Ohio were considered "valueless." *See* Fenner L. Stewart, *When the Shale Gale Hit Ohio: The Failures of the Dormant Mineral Act, Its Heroic Interpretations, and Grave Choices Facing the Supreme Court*, 43 Cap.U.L.Rev. 435, 445 (2015). That all changed when the gas boom reached Ohio. *Id.* at 437. When "the promise of rich gas royalties spread through the local communities in Eastern Ohio, owning land [came to be] like owning a lottery ticket." *Id.* at 438.

16

{¶ 39} Accordingly, in 2018, Senterra brought a quiet-title action to unify its surface land with the underlying severed mineral interests. The complaint named the known and unknown heirs and assigns of the Dermots, Winlands, the Russells, and other individuals and businesses either known or thought to have an interest in the property. Several heirs to the Winland-Dermot interest filed an answer. A large contingency of the defendants—including, one presumes, George Russell's heirs—failed to respond, and a default judgment was entered against them accordingly. In an affidavit, Senterra's representative, David Sensius, averred that he oversaw an extensive record search in Belmont County's public offices that did not identify the address or identity of any heir of George Russell. And Sensius published notice to George Russell and his unknown heirs in a local publication of general circulation, *The Times Leader*, without any heir coming forward.

{¶ 40} Senterra argued that all prior interests except for the 1954 George Russell exception were extinguished by operation of the Marketable Title Act. And it argued that George Russell's exception was void from the start because it was not possible to give effect to both the exception and the conveyance he had made. The trial court granted summary judgment to Senterra. It concluded that under the MTA, the Winland-Dermot and Joseph Russell interests were extinguished in favor of Senterra because Senterra had an unbroken chain of title to the property dating back more than 40 years that did not include those interests in the chain of title. It further concluded that the 1954 George Russell exception was void at the time it was made because it was impossible for him to convey his entire mineral interest while also retaining a part of the same interest. Thus, it quieted title in favor of Senterra, concluding that Senterra owned 100 percent of both the surface estate and the mineral estate.

{¶ 41} The Winland-Dermot heirs appealed to the Seventh District Court of Appeals. The court of appeals held that Senterra owns the entire surface estate as well as the extinguished Winland-Dermot and Joseph Russell mineral-interest

reservations or exceptions. 2019-Ohio-4387, 148 N.E.3d 34, ¶ 68, 73. But it reversed with respect to the 1954 George Russell exception, reasoning that "while the MTA extinguished the claims not preserved by the Winland-Dermot heirs and Joseph Russell's heirs, it also validated the defect George Russell created and validated his $^1/_4$ oil and gas interest reservation." *Id.* at ¶ 96. The court of appeals also concluded that a $^1/_8$ share of George Russell's original $^3/_8$-share mineral interest was extinguished in favor of Senterra, because George Russell had sought to retain only a $^2/_8$ share in the 1954 conveyance. *Id.* at ¶ 73.

{¶ 42} Although the Winland-Dermot heirs sought this court's review of the adverse portion of the court of appeals' decision, the only matter that remains for us to consider is Senterra's cross-appeal. *See* 158 Ohio St.3d 1522, 2020-Ohio-3018, 145 N.E.3d 311; 160 Ohio St.3d 1514, 2020-Ohio-6834, 159 N.E.3d 1178. Senterra challenges the court of appeals' decision that George Russell's heirs own a $^1/_4$ share of the mineral rights.

{¶ 43} It is unclear from the record why the Winland-Dermot heirs have elected to defend the portion of the court of appeals' judgment that assigns a fractional mineral interest to the heirs of George Russell. In their briefing to the court of appeals, they claimed to be "the heirs of Lulu E. Winland, James H. Winland, Alta H. Dermot, and William H. Dermot." But in their briefing to this court, they now claim to be "the heirs of Lulu E. Winland, James H. Winland, Alta H. Dermot, William H. Dermot, *George W. Russell, and Joseph E. Russell*." (Emphasis supplied.) There is nothing in the record, however, that documents any change to the parties in this case. It is curious, to say the least, that the majority never addresses this issue.

## II. ANALYSIS

*A. Under Established Principles of Property Law and through Application of the MTA, Senterra Owns All the Mineral Rights in the Property*

{¶ 44} The nub of this dispute is that in 1954, George Russell purported to convey more property than he owned—he owned a $^3/_8$ share of the mineral interest in the property but sought to convey a $^6/_8$ share and to also keep a $^2/_8$ share for himself. Today, Senterra owns the entire surface estate, the share of the mineral interest purchased by the Juzwiaks in 1954, and now, by operation of the MTA's extinguishment process, the mineral interests once retained by the Winland-Dermot families and by Joseph Russell. At issue is whether George Russell's heirs can claim a portion of the mineral interest by virtue of the "exception" language in the 1954 deed. The answer comes down to a couple basic questions of property law: Was George Russell's 1954 exception of a $^1/_4$-share mineral interest void at the time it was made because it was impossible for him to retain that interest and to also give effect to the conveyance he made? Or does application of the MTA overcome the fact that in 1954, George Russell transferred all the mineral interest he owned?

### 1. George Russell purported to convey more than he owned

{¶ 45} The majority launches right into a pseudo-MTA analysis. But before we get to the MTA, we need to understand the contemporaneous legal effect of George Russell's conveyance to the Juzwiaks in the 1954 deed. To gather the meaning of that written instrument, "it is the plain language of the deed that matters." *Koprivec v. Rails-to-Trails of Wayne Cty.*, 153 Ohio St.3d 137, 2018-Ohio-465, 102 N.E.3d 444, ¶ 23.

{¶ 46} The 1954 deed conveyed the property to the Juzwiaks, "[e]xcepting and reserving to George W. Russell, his heirs and assigns, one-fourth ($^1/_4$) of all oil and gas in and underlying the above described property." (Capitalization deleted.) Two points from this language warrant clarification.

**{¶ 47}** First, although it is commonplace for parties to a deed to "use the words 'reserve' and 'except' together," *LRC Realty, Inc. v. B.E.B. Properties*, 160 Ohio St.3d 218, 2020-Ohio-3196, 155 N.E.3d 852, ¶ 20, their meanings bear a "technical distinction," *Gill v. Fletcher*, 74 Ohio St. 295, 303, 78 N.E. 433 (1906). A reservation creates "a new property right," whereas an exception excludes from the conveyance a preexisting interest. *Peppertree Farms, L.L.C. v. Thonen*, 167 Ohio St.3d 52, 2022-Ohio-395, 188 N.E.3d 1061, ¶ 17-18. When, as here, a deed uses both labels, we look to "all the words of the instrument" to determine whether the parties intended to agree on a reservation or an exception. *See Gill* at 304. The 1954 deed makes apparent that George Russell and the Juzwiaks were not using the words in their technical sense, or else the phrase "excepting and reserving" would squarely contradict, *see Peppertree Farms* at ¶ 18-19, but rather in their commonsense meanings to explain that George Russell intended to retain a preexisting mineral interest. Consistent with an unbroken line of cases from *Gill* to *Peppertree Farms*, the retention of an existing interest is an exception, not a reservation. The 1954 conveyance therefore did not "create" a mineral interest for George Russell and his heirs.

**{¶ 48}** Second, George Russell purported to convey to the Juzwiaks the entire mineral estate, *except for* a $^1/_4$ share. The deed spells out the metes and bounds of the entire property being conveyed before it notes the exception. Although courts should attempt to reconcile granting and excepting language in a deed so that "effect will be given to both," 23 American Jurisprudence 2d, Deeds, Section 63 (2022), reconciliation is not possible for the 1954 deed. Sound deed construction requires that "when the deed reserves a fraction of the minerals under the land 'described,' then the deed reserves a fraction of the minerals *under the entire tract of land*, regardless of the part of the mineral estate actually conveyed." (Emphasis supplied.) 3A *Summers Oil and Gas*, Section 39:6 (3d Ed.2008). The defendants argued in the lower courts that George Russell had purported to convey

to the Juzwiaks just a $\frac{1}{8}$-share mineral interest (the difference between his $\frac{3}{8}$ share and $\frac{2}{8}$ exception), and that argument was rejected. *See* 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 66, 68. Rather—taking the deed's language at face value—George Russell purported to convey a $\frac{6}{8}$ share to the Juzwiaks, double what he owned.

### 2. The effect of George Russell's overconveyance

{¶ 49} It is foundational to property law that "a person cannot convey a greater interest in land than that person owns." *Carr v. Veach*, 244 W.Va. 73, 79, 851 S.E.2d 519 (2020); *see also Weber v. Eisentrager*, 498 N.W.2d 460, 464 (Minn.1993); *Moulton v. Bassett*, 1875 Ohio Misc. LEXIS 4, *13, 5 Ohio Dec.Rep. 257 (Ohio Super.1875). When George Russell purported to convey a $\frac{6}{8}$ share of the mineral interest and keep for himself a $\frac{2}{8}$ share, he did not disturb the interests retained by the Winland-Dermot families ($\frac{2}{8}$) or Joseph Russell ($\frac{3}{8}$). That leaves two possibilities. George Russell either conveyed his full $\frac{3}{8}$-share mineral interest to the Juzwiaks or he kept his $\frac{2}{8}$ share and conveyed to the Juzwiaks the $\frac{1}{8}$-share remainder. Put another way, because the conveyance and the exception cannot be given simultaneous effect, one must supersede the other. Under established principles of property law, the answer is clear that the conveyance superseded the exception.

{¶ 50} Nearly two centuries ago, this court provided guidance on such a situation. In *White's Lessee v. Sayre*, 2 Ohio 110 (1825), one joint tenant had attempted to convey more property than he owned. We held that the "[t]he circumstance that the grantor has attempted to convey more land than he was possessed of, shall not prevent the deed from conveying that of which he was possessed." *Id*. at 114. The "object" of a grant—that is, "the intention of the parties, apparent upon the face of the instrument"—"should be attained as far as is possible." *Id*. at 113.

{¶ 51} This court in *White* added that a deed "is to be construed most strongly against the grantor." *Id*. In the event of an overconveyance, " 'the risk of

loss is on the grantor.' " *Talbot v. Ward*, 2017-Ohio-9213, 102 N.E.3d 544, ¶ 72 (7th Dist.), quoting *Peterson v. Simpson*, 286 Ark. 177, 181, 690 S.W.2d 720 (1985). *White* accords with the general rule of overconveyance that when "the grantor's interest is insufficient to give effect to both the grant and a reservation, the reservation must fail and the risk of title loss is on the grantor." 23 American Jurisprudence 2d, Deeds, Section 63, citing *Cole v. Minor*, 518 So.2d 61, 62 (Ala.1987); *see also* 1 Williams & Meyers, *Oil and Gas Law*, Section 311 (2021). The majority refers to this intuitive principle as the "*Duhig* rule," majority opinion, ¶ 1, which bears the name of a Texas court-of-appeals case, *Duhig v. Peavy-Moore Lumber Co.*, 135 Tex. 503, 144 S.W.2d 878 (1940). *See also Morgan v. Roberts*, 434 So.2d 738, 740 (Ala.1983) (defendants' "warranty obligations were superior to their reservation of rights in the mineral interests"). Similarly, in Ohio, and in the context of escrow deeds, this court has long considered such deeds "to have been made *at the grantor's own risk*, as to innocent purchasers for value without notice." (Emphasis supplied.) *Micklethwait v. Fulton*, 129 Ohio St. 488, 491, 196 N.E. 166 (1935).

{¶ 52} The majority attacks a strawman, claiming that this dissent "incorrectly frames the *Duhig* rule." Majority opinion at ¶ 23. But as the above-cited authorities make clear, the rule we rely on—that when it is not possible to give effect to both a conveyance and a reservation, then the conveyance prevails—is one that is widely followed in jurisdictions across the United States (including Ohio) and one that applies well beyond the contours of the *Duhig* case. Indeed, it is telling that the majority "merely disagree[s]" with this dissent and Senterra that this defect rendered George Russell's exception or reservation void, majority opinion at ¶ 29, but fails to offer any plausible alternative understanding of George Russell's 1954 conveyance.

{¶ 53} Time-honored principles of property law establish that George Russell could have conveyed only what he owned and that he bore the risk of any

22

overconveyance. Thus, after the 1954 deed, the ownership of the property was as follows: the Juzwiaks owned the entire 86-acre surface estate and a $^3/_8$ share of the mineral interest (formerly George Russell's); Joseph Russell owned a $^3/_8$ mineral-interest share pursuant to his 1941 reservation or exception; and the Winland-Dermot families owned a $^2/_8$ mineral-interest share pursuant to its 1925 reservation or exception. Because effect could not be given to both George Russell's exception and his conveyance to the Juzwiaks, his exception was void.

### 3. The Marketable Title Act

{¶ 54} Even though George Russell's exception was a dead letter in 1954, we must still assess the MTA's legal import on the fact that his $^1/_4$-share exception carried through the chain of title from 1954 onward. As I explain below, the MTA does not resuscitate George Russell's void exception.

{¶ 55} This court has repeatedly detailed the workings of the MTA. *See, e.g.*, *West v. Bode*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298, ¶ 15-17; *Blackstone v. Moore*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, ¶ 7-8. The MTA generally allows a landowner who has an unbroken chain of title to a property interest for a 40-year period following the root of title to transfer title free of any interests that existed prior to the root of title. *Blackstone* at ¶ 1. "Root of title" is a title transaction "purporting to create the interest claimed" that was the most recent to be recorded as of a date 40 years prior to the time when marketability is being determined. R.C. 5301.47(E). The MTA "does not prescribe a flat period like a statute of limitations"; rather, a title examiner "must always extend his examination beyond 40 years to the root." 1 Sherman, *Ohio Residential Real Estate*, Section 5.03 (2022).

{¶ 56} The MTA operates to extinguish "interests and claims" that existed prior to the root of title, R.C. 5301.47(A), unless a designated saving event preserved the interest, R.C. 5301.49. For example, "[a]ny interest arising out of a

title transaction which has been recorded subsequent to the effective date of the root of title" is not extinguishable. *Id.*

**{¶ 57}** Applying the MTA, the courts below quieted title to the Winland-Dermot and Joseph Russell mineral interests. 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 29, 68, 73. Because no saving events occurred in the 40-year period subsequent to the roots of title to those interests, the Winland-Dermot and Joseph Russell interests were extinguished. *Id.* Thereby, the interests reverted to the surface estate owned by Senterra. *See* R.C. 5301.55; *Peppertree Farms, L.L.C.*, 167 Ohio St.3d 52, 2022-Ohio-395, 188 N.E.3d 1061, at ¶ 5 (citing the MTA as a "mechanism[] to reunite a surface estate with its severed mineral interest").

**{¶ 58}** As for the purported 1954 George Russell exception, the MTA has no impact. No heir of George Russell has pursued a quiet-title action, nor has anyone presented a chain of title to the purported $^{1}/_{4}$-share mineral interest. Moreover, the trial court entered a default judgment against George Russell's heirs. So there is no occasion to analyze whether they could rely on the MTA to establish marketable title. Nor is there any evidence in the record before us that allows us to conduct such an analysis. Indeed, Senterra submitted an affidavit averring that a thorough investigation of the public records in Belmont County failed to identify any of George Russell's heirs.

**{¶ 59}** The only claim at bar is Senterra's quiet-title claim. The MTA does not extinguish the purported 1954 George Russell exception, because the exception was listed in the muniments of Senterra's title. Rather, the trial court properly found that the exception was never valid based on common-law principles. The interest was void when it was recorded because George Russell could not except for himself what he had conveyed.

**{¶ 60}** The result of all this is that Senterra owns the entire mineral estate. It obtained a $^{3}/_{8}$ share by virtue of its purchase of what was at one time the Juzwiak's

interest in the property, and it obtained the remainder through operation of the MTA.

**{¶ 61}** Sometimes pictures tell a story more easily than words. The following chart shows the various conveyances and their ultimate legal effect on the ownership rights:



*B. The Majority Misapplies the MTA*

{¶ 62} The majority holds that the MTA resuscitates George Russell's inoperative exception. In a cursory analysis, the majority identifies a 40-year period from 1971 to 2011 in which George Russell's exception was noted in Senterra's chain of title. Essentially, it reasons that even though George Russell did not own any mineral interest after the 1954 conveyance, because the Juzwiaks's chain of title refers to a purported $^1/_4$ interest, the MTA can be used to give effect to George Russell's void 1954 exception. But this misunderstands the MTA.

**1. The MTA does not validate the inoperative 1954 George Russell exception**

{¶ 63} The majority holds that because "there is an unbroken chain of record title to the [purported George Russell $^1/_4$-share exception] for at least 40 years following the root-of-title deed to the property," the MTA applies to preserve the interest. Majority opinion at ¶ 2; *see also id.* at ¶ 24 (referring to "the more than 40-year unbroken chain of record title that preserved George Russell's one-quarter oil and gas interest under the MTA"); *id.* at ¶ 30 ("the heirs' interest was preserved under the MTA"). In doing so, the majority affirms the court of appeals' holding that "[t]he MTA validates the $^1/_4$ oil and gas interest claimed by George Russell's heirs," 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 94. *See also* majority opinion at ¶ 20 ("We agree with the court of appeals * * *").

{¶ 64} But the MTA cannot validate defunct interests. Rather, it operates to "extinguish" latent, severed "interests and claims," R.C. 5301.47(A), rendering them "null and void," R.C. 5301.50, in order to make a "record chain of title" more "rel[iable]," R.C. 5301.55.

{¶ 65} The majority holds that through application of the MTA, George Russell's heirs have marketable title to a $^1/_4$-share mineral interest in the property. But it reaches this conclusion without engaging in any actual analysis under the MTA as it applies to any purported title *claimed by the George Russell heirs.*

**{¶ 66}** Remember, this case involves a quiet-title claim *filed by Senterra*. Through application of the MTA, the trial court determined that the Winland-Dermot and George Russell interests were extinguished in favor of Senterra because those interests were created prior to the root-of-title events and were not preserved in the muniments of title or by a saving event. But the purported George Russell interest could not be extinguished *under the MTA*, because it was recorded in the post-root chain of title. *See Spring Lakes, Ltd. v. O.F.M. Co.*, 12 Ohio St.3d 333, 334, 467 N.E.2d 537 (1984), quoting *Toth v. Berks Title Ins. Co.*, 6 Ohio St.3d 338, 342, 453 N.E.2d 639 (1983) (Celebrezze, C.J., dissenting) (" 'the Marketable Title Act does not bear upon interests affecting the realty which are created subsequent to the date of the root of title' "). There was no need to rely on the MTA to extinguish that interest. As the trial court properly found, the purported George Russell exception was void. Thus, Senterra holds the property free and clear of all competing interests.

**{¶ 67}** The majority proclaims that the MTA validates the inoperative 1954 George Russell exception without any analysis of the MTA's applicability to that interest. In order to rely on the MTA, a party must be able to show an "unbroken chain of title" to the property. R.C. 5301.48. Here, none of George Russell's heirs have identified a recorded title transaction that occurred subsequent to George Russell's 1954 exception under which the heir claims an interest. Indeed, no George Russell heir has appeared at all. So nothing in the record suggests that any George Russell heir has an unbroken chain of title to the purported interest. *See id.*

**{¶ 68}** Furthermore, to establish that the MTA granted an heir of George Russell marketable title, one first has to identify the root of title for that interest. The majority says that "there is an unbroken chain of record title to the oil and gas interest at issue for at least 40 years following the root-of-title deed to the property," majority opinion at ¶ 2—but it appears to be referring to the root of title for the interests claimed by Senterra, not the $^1/_4$-share mineral interest claimed by George

Russell's heirs. Under the MTA, the root of title depends on the interest claimed; thus, different interests will have different roots. *See* 1 Sherman, *Ohio Residential Real Estate*, Section 5.03.

**{¶ 69}** Recall that under the MTA, the root of title must be a title transaction "purporting to create the interest claimed." R.C. 5301.47(E). The interest claimed by the George Russell heirs is the $^1/_4$-share mineral interest that George Russell attempted to "except[] and reserv[e]" in 1954. One would be hard pressed to say that the 1954 deed "purport[ed] to create," *id.*, the interest claimed by the George Russell heirs. As noted above, the better interpretation of the deed is that George Russell intended to except from the conveyance a portion of a previously created interest he then owned. The 1954 deed did not convey anything to George Russell; he simply sought to acknowledge (albeit incorrectly) in the deed that he was not conveying a $^1/_4$-share mineral interest in the property. Thus, the 1954 deed cannot be the root of title.

**{¶ 70}** A better candidate for the root of title is the 1925 deed transferring the Wilmot-Dermot interest to Joseph and George Russell. This is the conveyance that first created the mineral interest at issue. A title search conducted using the 1925 conveyance as the root of title—and going forward 40 years—would demonstrate that George Russell's purported 1954 exception was void. Or even if one considers the 1941 conveyance (in which the Russells bifurcated their interest) the better root, one arrives at the same result. Both the Joseph Russell interest and the Winland-Dermot interest are contained within the record chain of title. And it is evident from these records of title that after giving effect to the conveyance to the Juzwiaks, there was no interest left for George Russell to retain. The purported George Russell exception, then, is a defect "inherent in the muniments of which such chain of record title is formed." R.C. 5301.49(A). Thus, regardless of whether the 1925 or the 1941 conveyance is the root of title, George Russell's heirs cannot establish marketable title because they cannot identify a 40-year period

following the root of title "with nothing appearing of record * * * purporting to divest [them] of such purported interest." R.C. 5301.48(B); *see also* 1 Sherman, *Ohio Residential Real Estate*, Section 5.08 (explaining that a "void deed" recorded after the root of title cannot constitute the basis for marketable title).

**{¶ 71}** The mistake that the majority makes is to assume that simply because an interest appears in a chain of title for a 40-year period, then the interest is validated by the MTA. *See* majority opinion at ¶ 24 (referring to "the more than 40-year unbroken chain of record title that preserved George Russell's one-quarter oil and gas interest"). But that is not the way the MTA works. Under the MTA, one must trace each claimed interest back to the root of title for the interest and determine whether the putative holder of that interest has marketable title. The majority posits that the 1971 conveyance is the root of title for the George Russell heirs. But by definition, the root must "purport[] to create the interest claimed," R.C. 5301.47(E), which logically must predate George Russell's reservation or exception. One cannot reserve an interest yet to be created. Nothing in the record demonstrates that any of the George Russell heirs has marketable title to the property.

**{¶ 72}** The majority responds not with analysis, but with rhetoric: it accuses this dissent of "cherry-picking" a new root of title and being "nonsensical." Majority opinion at ¶ 29. But this merely underlines the majority's misunderstanding of the MTA. The point made by this dissent is simply that if the majority is going to use the MTA to effectively quiet title in favor of the George Russell heirs—despite the fact that they have never even appeared and claimed an interest—it must actually apply the MTA by identifying the correct root of title for the interest claimed. *See* 1 Sherman, *Ohio Residential Real Estate*, Section 5.03. Yet the majority refuses to engage in any such analysis.

### 2. Senterra has established its entitlement to all the mineral interests

{¶ 73} Another way to see the majority's error is to ask this question: Where does the mineral interest that the majority grants to George Russell's heirs come from? After all, in 1954, George Russell gave away all the mineral interest he owned, so if the MTA somehow revested any interest in George Russell's heirs, it would have to come at the expense of some other interest.

{¶ 74} So what mineral interest was extinguished in order to convert George Russell's once-defunct exception into an interest with marketable record title? The options, we know, are limited to the Winland-Dermot interest, the Joseph Russell interest, or the Juzwiak interest that Senterra eventually purchased—which collectively comprise the property's complete mineral estate. Let's use the process of elimination.

{¶ 75} First off, the Juzwiak-turned-Senterra $^3/_8$ share is not a candidate for extinguishment. The Juzwiak interest was created in the 1954 conveyance by George Russell and passed through the chain of title to Senterra. With each successive conveyance, the Juzwiak interest was noted (with sufficient specificity) in the deeds to save it from extinguishment. *See Blackstone*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, at ¶ 11. Thus, the reference to the original Juzwiak interest "in the muniments" of each conveyance following the root of title "preserve[d Senterra's] interest in the record title," *id.* at ¶ 18, under R.C. 5301.49(A) and (D). Cross off that $^3/_8$ share.

{¶ 76} Next, we can discard the Winland-Dermot $^2/_8$ share and the Joseph Russell $^3/_8$ share, for this litigation has already established that those interests were extinguished in favor of Senterra. *See* 2019-Ohio-4387, 148 N.E.3d 34, at ¶ 67-68, 73 (affirming the trial court's judgment as to those interests). As the court of appeals held, Senterra "has an unbroken chain of title" to the Winland-Dermot interest, *id.* at ¶ 67, and "an unbroken chain of title and record marketable title to George Russell's previously retained $^1/_8$ oil and gas interest and Joseph Russell's

previously retained $^3/_8$ oil and gas interest," *id*. at ¶ 73. That portion of the court of appeals' judgment is not before this court.

{¶ 77} In earlier stages of this litigation, the court of appeals determined that Senterra's title of record had operated to extinguish the Winland-Dermot $^2/_8$-share mineral interest and the Joseph Russell $^3/_8$-share mineral interest. *Id*. at ¶ 68, 73. As for the remaining $^3/_8$-share mineral interest—which George Russell conveyed to the Juzwiaks in 1954—Senterra purchased that share in 2012, along with the entire 86-acre surface estate. The chain of title documents this history. George Russell's heirs cannot claim an extinguished interest premised on a void exception at Senterra's expense. Senterra is entitled to an unencumbered marketable record title to the property.

### 3. The majority adopts a reading of the MTA at odds with the act's text and purpose

{¶ 78} Not only does the majority misread the MTA, but by doing so it arrives at a result that is contrary to the MTA's purpose. Extinguishment under the MTA is a "statutory mechanism[] that may be used to reunite severed mineral interests with the surface property subject to those interests." *West*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298, at ¶ 2. It was intended to "simplify[] and facilitat[e] land title transactions." R.C. 5301.55. The surface estate at issue here has been severed from its underlying mineral interest for roughly a century. The majority applies the MTA not to unify the surface- and subterranean-land interests—Senterra owns the full surface estate—but to entrench the bifurcation of those interests. It would be one thing if the text of the MTA compelled a result so at odds with its codified purpose. But here, the majority adopts a novel application of the MTA to reach a result contrary to its purpose.

### III. CONCLUSION

{¶ 79} Under the plain terms of the MTA and the common law, Senterra owns all the mineral rights at issue in the property. Because the majority misapplies the MTA and reaches a different conclusion, I respectfully dissent.

KENNEDY and FISCHER, JJ., concur in the foregoing opinion.

———————————

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Matthew W. Onest, and Wayne A. Boyer, for appellee and cross-appellant.

The White Law Office Co., Thomas D. White, and Katherine M.K. Kimble, for appellants and cross-appellees.

———————————