[Cite as *Miller v. Rice Drilling D L.L.C.*, 2023-Ohio-3588.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

SHAWN MILLER et al.,

Plaintiffs-Appellants,

v.

RICE DRILLING D LLC et al.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 22 BE 0050

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 19CV52

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Todd M. Kildow*, Emens, Wolper, Jacobs & Jasin Law Firm, 250 West Main Street, Suite A, St. Clairsville, Ohio 43950 for Plaintiffs-Appellants and

*Atty. John Kevin West*, *Atty. Dallas F. Kratzer III,* Steptoe & Johnson, PLLC, 41 South High Street, Suite 2200, Columbus, Ohio 43215 for Defendants-Appellees Rice Drilling D, LLC and EQT Production Company and

*Atty. Kyle W. Bickford, Atty. Erik A. Schramm, Jr.,* Hanlon, McCormick, Schramm, Bickford & Schramm Co., LPA, 46457 National Road West, St. Clairsville, Ohio 43950 for Defendants-Appellees Stoneking Heirs and

*Atty. Kyle S. Witucky, Atty. Grant J. Stubbins, Atty. Carter A. Brown,* Stubbins, Watson, Bryan & Witucky, Co., LPA, 59 N. 4th Street, P.O. Box 488, Zanesville, Ohio 43702 for Defendants-Appellees McGath, et al and

*Atty. Aaron M. Bruggeman, Atty. Kara H. Herrnstein*, Bricker Graydon, LLP, 160 East Main Street, Barnesville, OH 43713 for Defendants-Appellees Gulfport Energy Corporation.

Dated: September 28, 2023

**Robb, J.**

{¶1} This appeal concerns the oil and gas mineral interests relating to 74.444 acres of real estate located in Smith Township. Appellants/Plaintiffs, surface owners of the real estate, filed suit seeking a determination they are the rightful owners of the property's oil and gas interests and that certain Appellees/Defendants' interests, if any, were extinguished and/or abandoned via the Marketable Title Act and Dormant Mineral Act vesting all oil and gas rights underlying the property in Appellants. Appellants also asserted a claim for breach of contract, alleging other Appellees/Defendants breached the parties' oil and gas lease agreement by failing to pay royalties.

{¶2} The trial court ultimately granted summary judgment against Appellants and in favor of Appellees/Defendants on all counts. The court found Appellees' oil and gas mineral interests were not extinguished or abandoned and there was also no breach of contract.

{¶3} Appellants argue on appeal that the trial court erred as a matter of law by holding the Marketable Title Act did not extinguish Appellees' oil and gas interests. They also claim the trial court erred by concluding Appellees' interests were not abandoned via the Dormant Mineral Act. Last, Appellants contend reversal is required because the trial court erred by finding certain Appellees were not in breach of the parties' oil and gas lease agreement. Appellants claim they are entitled to summary judgment in their favor. For the following reasons, we affirm.

## Statement of the Case

{¶4} Appellants, Shawn Miller, Christopher Kinkade, Dana Fularz, James Kinkade, Suzanne Perks, and Joy Roberts, filed their complaint to quiet title to the oil and

Case No. 22 BE 0050

gas mineral interest in their real estate, known as Belmont County Auditor Parcel No. 36-00386.000. In their complaint, they claim to own 100 percent of the mineral interests underlying their property. Appellants also sought declaratory judgment and filed claims for breach of contract, specific performance, and slander of title against Appellees. (February 5, 2019 Complaint.)

{¶5}  Appellees consist of  Rice Drilling D, LLC and EQT Production Company (collectively "EQT"); Gulfport Energy Corporation ("Gulfport"); Marigold Marsh,  Mary Jane Butler, Joel Butler, Candace Romitti, Douglas Romitti, Julia E. Adams, Mark Adams, Cindy E. Westling, William A. Westling, Joseph Price, Mary A. Price, James B. Price, Martha Price, Patricia Sokol, David Sokol, Nicole A. Floyd, Jeffrey S. Floyd, Kurt M. Floyd, and Karen A. Floyd (the Marsh Defendants); and Julia A. McGath, William T. Jones, Joanna Sue Jones, and James R. Workman (the McGath Defendants).[1]

{¶6}  Both the Marsh Defendants and the McGath Defendants are descendants of J.W. Stoneking and are referred to collectively herein as the Stoneking heirs.  No individuals claiming to be successors in interest to the Gump interest have filed an appearance in this lawsuit.

{¶7}  Appellants' first claim for relief asserts that via the Marketable Title Act (MTA), all the oil and gas mineral interests and related royalty interests associated with the real estate became vested in them by an unbroken chain of title for more than 40 years with a root title deed filed June 2, 1972.  Appellants claim they became record title owners of all the mineral interests on or before June 3, 2013.  They assert the date of marketability is June 2, 2012.  (Complaint ¶ 20-29, Exhibit C.)

{¶8}  In support of their MTA claim, Appellants rely on a judgment entry issued in a prior court of common pleas case which held the Defendants' oil and gas mineral interests were extinguished via the MTA and vested all rights in Appellants.  (Complaint ¶ 20-29, Exhibit E.)  That judgment is captioned *Dana L. Fularz et al. v. Larry Parker et al.* and indicates it is both a journal entry and settlement agreement.  It was filed in a separate case on December 18, 2012, in Belmont County Court of Common Pleas case

---

[1] Several other individuals were named as party defendants, but were either dismissed or had default judgments rendered against them.  These individuals are not parties on appeal.

number 12 CV 458. It is signed by the judge and the parties to that case. (Complaint Exhibit E.)

{¶9} Notwithstanding their attachment and reliance on a settlement agreement entered in a different case, Appellants did not file suit in the name of or on behalf of the nonparties, the Parkers, who were the owners of the 63/64 interest repeated in the chain of title from 1922 until 1988. Appellants did not sue as the assignees or successors of the Parkers' rights. Instead, Appellants claim in their complaint that the 2012 lawsuit is binding in this case and that it correctly held the Parkers', the Gumps', and the Stonekings' oil and gas interests were extinguished. Alternatively, and regardless of the prior lawsuit or trial court judgment, Appellants claim the Gump and Stoneking interests were extinguished by operation of law via the MTA and this prior settlement agreement evidences this alleged fact. (Complaint ¶ 20-29, Exhibit C.)

{¶10} Appellants' second claim for relief contends, pursuant to the Dormant Mineral Act (DMA), Appellees' reserved oil and gas mineral interest rights were abandoned and vested in Appellants by operation of law. (Complaint ¶ 30-35.)

{¶11} Appellants' third claim asserts they entered an oil and gas lease with Rice Drilling recorded in 2013. Appellants assert Rice Drilling and Gulfport Energy Corporation, as Rice Drilling's assignee, were procuring oil and/or gas from the subject property, but they had not made the agreed upon royalty payments to Appellants. Appellants also claim that EQT Production Company is the owner/member of Rice Drilling and EQT was acting as lessee under Appellants' lease. Appellants claim Rice Drilling, Gulfport, and EQT were in a breach of contract for failing to honor the terms of the agreement and by making said royalty payments to other named defendants without notice to Appellants. (Complaint ¶ 45-61.)

{¶12} EQT counterclaimed and asserted claims to quiet title, for declaratory judgment, breach of contract, and others. (March 4, 2019 Answer and Counterclaim.) The Marsh Defendants filed a joint answer and counterclaim. (March 25, 2019 Answer & Counterclaim.)

{¶13} Appellants moved to dismiss the counterclaims against them, which the trial court overruled. It explained in part:

> It is * * * a concern that Plaintiffs seem to argue that this Court is bound by prior Common Pleas Court decisions * * *. The Court notes that these subject Defendants were not parties to that said Common Pleas Court case, which in any event, appears to have been settled for some undisclosed reason, rather than to have been decided on the merits. Thus, without more, this Court does not consider itself bound by that decision.

(Emphasis added.) (July 17, 2018 Judgment Entry.) Appellants did not appeal this judgment and do not challenge the trial court's conclusions of law or fact included in its July 17, 2018 judgment overruling their motion to dismiss.

{¶14} EQT subsequently dismissed its counterclaim on April 22, 2019.

{¶15} Appellants then moved for summary judgment. Consistent with the allegations in their complaint, Appellants claimed effective June 2, 2012, the Gump heirs' and Stoneking heirs' mineral interests, if any, were extinguished pursuant to the Marketable Title Act. Appellants claimed the previously severed mineral interests were vested in them, as surface owners, via an unbroken chain of title for more than 40 years with a root deed recorded on June 2, 1972. In support of their argument, Appellants relied on the journal entry and settlement agreement issued in the prior case for this proposition, urging the trial court to find that the Marketable Title Act vested all rights in them. They claimed the prior judgment embodies the legal conclusion they rely on, but Appellants acknowledged Appellees were not parties to that litigation. Regardless, Appellants claim the prior judgment is correct and the oil and gas rights at issue in this case were automatically extinguished in June of 2012.[2] (June 18, 2020 Motion for Summary Judgment.)

{¶16} Alternatively, Appellants claimed pursuant to the Dormant Mineral Act, Appellees abandoned any interest they had in the property's mineral interests. In support,

---

[2] Although not raised as an argument on appeal, we note a judgment entry and settlement agreement issued in a different court of common pleas case in a proceeding in which the defendants were not parties is not generally controlling here. *Henderson v. Haverfield*, 7th Dist. Harrison No. 21 HA 0005, 2022-Ohio-2194, ¶ 79. "[N]either the trial court nor this court is bound to follow trial court decisions on the same issue involving different parties. *See In re Lebanon Health Care Ctr.*, 10th Dist. No. 86AP-168 (Aug. 26, 1986) (finding '[a] decision of one branch of a common pleas court is not binding upon any other branch of the same court'); *Cyr v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 21AP-273, 2022-Ohio-25, ¶ 15; *see also Camreta v. Greene*, 563 U.S. 692, 709, 131 S.Ct. 2020, fn 7 (explaining that district court decisions are not binding precedent even in the same district or upon the same judge.)" *Id.*

Case No. 22 BE 0050

Appellants relied on the affidavit of Suzanne Perks, one of the Appellants and an owner of the real property. Perks states in her affidavit that she conducted the underlying research into the property's severed mineral interest to reunite the severed mineral interests with the surface. Perks states in part that she served notice of abandonment on the Stoneking heirs via publication after she:

> located at least seven persons with the initials and last name of J.W. Stoneking who resided in either Ohio or West Virginia during the time period of 1900 to 1930. That none of my research of online government records led me to the actual identity of J.W. Stoneking who held the oil gas agreement on the property. * * * That I was unable to locate any record that conclusively identified which J.W. Stoneking held the mineral interest, thereby preventing me from serving Notice by Certified Letter.

(MSJ Exhibit 5, Perks Affidavit.)

{¶17} Regarding a separate potential mineral interest, Perks states in her affidavit she served "the majority of the Stillion children with Certified Letters[,]" and they filed a Notice to Preserve the Stillion mineral interest with the Belmont County Recorder's Office in October of 2011. (June 18, 2020 Motion for Summary Judgment.) (MSJ Exhibit 5, Perks Affidavit.)

{¶18} Finally, Appellants moved for summary judgment in their favor on their breach of contract claim against EQT and Gulfport. Appellants claimed EQT and Gulfport breached the parties' lease agreement based on their failure to pay royalties due to Appellants. Instead, Appellants claimed EQT and Gulfport converted the oil and gas payments owed. (June 18, 2020 Motion for Summary Judgment.)

{¶19} The Marsh Defendants filed a combined motion for summary judgment and opposition to Appellant's motion. They claimed summary judgment was warranted in their favor. In support, they alleged Appellants ignored the notice provisions in the 2006 Dormant Mineral Act and precedent when they chose not to serve J.W. Stoneking or any of the Stoneking heirs with the notice of abandonment by certified mail. They claimed Appellants failed to undergo a reasonable search for the Stoneking heirs before turning to service by publication.

**{¶20}** Additionally, the Stoneking heirs sought summary judgment in their favor under the MTA. They claimed the Stoneking interest was the subject of several title transactions, which prevented extinguishment. (July 16, 2020 Motion in Opposition.)

**{¶21}** Thereafter, Appellees jointly moved the trial court to stay the proceedings because two potentially controlling cases were being addressed by the Ohio Supreme Court. Appellants opposed the stay.

**{¶22}** Appellants also filed a motion seeking the court to order EQT and Gulfport to pay the suspended royalties owed to them. Appellees opposed Appellants' motion for royalties during the pendency of the case, contending the payment of royalties were in dispute in this ongoing litigation.

**{¶23}** EQT's opposition to summary judgment argued in part that Appellants' root of title could not be the 1972 deed because the root of title "must create the interest claimed by such person, upon which he relies as the basis for marketability of his title" quoting R.C. 5301.47(E). (July 16, 2020 Joint Response of Rice Drilling and EQT to Motion for Summary Judgment.)

**{¶24}** The Stoneking heirs opposed Appellant's summary judgment motion and also moved for summary judgment in its favor. (July 16, 2020 Stoneking heirs' Response in Opposition and Motion for Summary Judgment.)

**{¶25}** The trial court stayed the proceeding based on the pending decisions in the Ohio Supreme Court consistent with Appellees' motion. (October 29, 2020 Judgment.) A flurry of summary judgment filings resumed in July of 2021 based on the Supreme Court's then recent decisions in *Gerrity v. Chervenak*, 162 Ohio St.3d 694, 2020-Ohio-6705, 166 N.E.3d 1230, and *West v. Bode*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.3d 298.

**{¶26}** The trial court held a summary judgment hearing and a hearing on all pending motions in August of 2022. The court granted the parties leave to submit proposed findings of fact and conclusions of law. (August 8, 2022 Motion Hearing.)

**{¶27}** The trial court subsequently granted summary judgment in favor of Appellees for all claims asserted against them and against Appellants. It found the Stoneking interest and the Gump interest were still viable. It also held EQT and Gulfport

were not in breach of contract based on their alleged failure to pay Appellants via the lease agreements.  (September 9, 2022 Order.)

{¶28}  Appellants raise three assignments of error.

## Standard of Review

{¶29}  The interpretation of deeds is generally a question of law for the court to decide.  And courts should employ contract construction rules to interpret deeds, guided by a plain reading of the words in the four corners of the document.  *McGiffin v. Skurich*, 2021-Ohio-2741, 176 N.E.3d 833, ¶ 20 (7th Dist.), citing *Long Beach Assn., Inc. v. Jones*, 82 Ohio St.3d 574, 576, 697 N.E.2d 208 (1998), and *LRC Realty, Inc. v. B.E.B. Properties*, 160 Ohio St.3d 218, 2020-Ohio-3196, 155 N.E.3d 852, ¶ 17.

{¶30}  We review summary judgment decisions de novo and apply the same test as the trial court in determining whether summary judgment was proper.  *Cole v. Am. Industries & Resources Corp.*, 128 Ohio App.3d 546, 552, 715 N.E.2d 1179 (7th Dist.1998).

{¶31}  Pursuant to Civ.R. 56(C), summary judgment should be granted when reasonable minds could reach but one conclusion and that conclusion is adverse to the nonmoving party.  The moving party has the burden of showing no issue exists as to any material fact.  *State v. Licsak*, 41 Ohio App.2d 165, 324 N.E.2d 589 (1974); *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus (1988).

{¶32}  Once the moving party meets his burden, the opposing party may not rely on the allegations in his pleadings, but must set forth facts showing there is a genuine issue and produce evidence on issues that the party has the burden of proving at trial.  Civ.R. 56(E); *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In determining a motion for summary judgment, the trial court will construe the evidence most strongly in favor of the nonmoving party and grant summary judgment where that party fails to make a showing sufficient to establish the existence of an essential element upon which the party bears the burden of production.  *Celotex,* at 322, 106 S.Ct. 2548.

**Chain of Title**

{¶33} The certified copies of the documents in the property's chain of title filed by Appellants, ending in 1998, include the following sixteen documents listed from most recent to the oldest. (July 30, 2021 Certified Deeds in Chain of Title.)

{¶34} 1. A 1998 survivorship quitclaim deed conveys 82.963 acres from Joy Kinkade to Appellants, Dana Fularz, Christopher Kinkade, Shawn Miller, James R. Kinkade, and Suzanne Perks, for their joint lives with the remainder to the survivor. It excepts 10.737 acres. It also states the conveyance was, "Also EXCEPTING and reserving sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises." Thus, this deed conveyed to Appellants 1/64 of the oil and gas in and under the property. The deed also excepts 4.722 acres and another 1.797 conveyed to Cale C. Norris, Jr. and Melissa K. Norris. The grantor, Joy Kinkade, reserved a life estate. It is dated July 23, 1998.

{¶35} 2. A December 3, 1975 affidavit was filed, which states Robert E. Kinkade died on December 3, 1973, and pursuant to a May 26, 1972 Warranty Deed, Joy Kinkade became "the sole owner, and vested with the entire fee simple title, to the above described property * * *." (December 3, 1975 Affidavit for Transfer to Survivor.) This affidavit does not contain any reservation of oil or gas rights; it excepts 10.737 acres.

{¶36} 3. A June 2, 1972 survivorship deed was filed at Volume 531 page 583-585, by which William and Mildred Britton granted to Robert and Joy Kinkade for their joint lives with remainder to the survivor 93.70 acres and excepting 10.737 acres, and thus conveying 82.963 acres. The June 1972 survivorship deed also states: "ALSO EXCEPTING and reserving sixty-three sixty fourths (63/64) of all the oil and gas in and under said premises." (June 2, 1972 Survivorship Deed.)

{¶37} 4. A warranty deed was recorded on May 10, 1957, by which Thomas and Vera Stillion conveyed to William and Mildred Britton "91 acres and 66 perches." This 1957 deed also states it was, "[a]lso excepting and reserving sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises, and in the event a fifteen (15) barrel well is drilled on the within described premises and produces daily for one month fifteen barrels per day, J.W. Stoneking is to pay J.A. Ramsey and wife, Grantee, * * * ($187.50). And Lewis Gump and wife * * * ($375.00). And the said Lewis Gump and wife

are to pay James A. Ramsey and wife * * * ($100.00) for each and every well drilled on the above described premises after April 1, 1922, A.D." (May 10, 1957 Warranty Deed.)

{¶38} 5.  Pursuant to the July 30, 1954 warranty deed, Herman and Garneda Bartolomucci granted real property to Thomas and Vera Stillion consisting of 91 acres and 66 perches.  This deed also states it was:  "ALSO EXCEPTING AND RESERVING sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises, and in the event of a fifteen (15) barrel Well is drilled on the within described premises and produces daily for one month fifteen barrels per day J.W. Stoneking is to pay J.A. Ramsey and wife, Grantees, * * * ($187.50).  And Lewis Gump and wife * * * ($375).  And the said Lewis Gump and wife are to pay James A. Ramsey and wife * * * ($100.00) for each and every well drilled on the above described premises after April 1, 1922, A.D." (July 30, 1954 Warranty Deed.)

{¶39} 6.  In the August 21, 1945 warranty deed, the grantor Estelle Boston conveyed to Herman and Garneda Bartolomucci real estate consisting of 91 acres and 66 perches.  This deed also states:  "Also excepting and reserving sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises, and in the event of a fifteen barrel well is drilled on the within described premises and produces daily for one month fifteen barrels per day J.W. Stoneking is to pay to J.A. Ramsey and wife,  * * * ($187.50) * * *, and Lewis Gump and wife, * * * ($375.00), and the said Lewis Gump and wife, are to pay James A. Ramsey and wife, * * * ($100.00), for each and every well drilled on the above described premises after April 1, 1922, A.D."  (August 21, 1945 Warranty Deed.)

{¶40} 7.  The October 2, 1944 deed conveys 91 acres and 66 perches to Estelle Boston from Ruth Tubaugh.  This deed also states:  "Also excepting and reserving sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises, and in the event of a fifteen (15) barrel well is drilled on the within described premises and produces daily for one month fifteen barrels per day J.W. Stoneking is to pay to J.A. Ramsey and Wife, Grantees, * * * ($187.50).  And Lewis Gump and wife * * * ($375.00).  And the said Lewis Gump and wife are to pay James A. Ramsey and wife * * * ($100.00) for each and every well drilled on the above described premises after April 1, 1922, A.D." (October 2, 1944 Deed.)

{¶41} 8. The March 16, 1939 deed conveys the property from the Belmont County Realty Development Company to Ruth Tubaugh. This conveyance contains the 63/64 reservation and the fifteen barrel provision requiring the payment of money. (March 16, 1939 Deed.)

{¶42} 9. The October 15, 1938 deed conveys 91 acres and 66 perches to the Belmont County Realty Development Company from Elizabeth Mobley. This deed contains the 63/64 reservation of oil and gas with the 15 barrel well payment provision involving J.W. Stoneking, J.A. Ramsey and wife, and Lewis Gump and wife. (October 15, 1938 Deed.)

{¶43} 10. The July 13, 1938 deed of correction conveys real estate consisting of 91 acres and 66 perches to the Belmont County Realty Development Co. from Elizabeth Mobley and William and Golda Mobley. This deed excepts and reserves "sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises * * *." It also contains the 15 barrel provision triggering payments of money by J.W. Stoneking to "J.A. Ramsey and wife, Grantees" and "Lewis Gump and wife * * *" and from the Gumps to the Ramseys "for each and every well drilled" on the property after April 1, 1922. (July 13, 1938 Deed of Correction.)

{¶44} 11. The May 12, 1931 deed conveys the property via a sheriff's sale to Elizabeth and Walter Mobley from James and Jennie Ramsey. This deed excepts from the conveyance 63/64 of all the oil and gas in and under said property. It also includes the payment provision depending on the number of wells drilled and barrels secured. (May 12, 1931 Deed.)

{¶45} 12. The deed recorded July 7, 1922 shows William and Leona Parker granted 91 acres and 66 perches of real property to James and Jennie Ramsey. This deed also created and excepted and reserved "63/64 of all the oil and gas under said premises, and in the event a fifteen barrel well (15) is drilled on the within described premises and produces daily for one month (15 barrels per day) J.W. Stoneking is to pay to J.A. Ramsey and wife grantees, * * * ($187.50) Felix Parker and wife * * * ($187.50) and Lewis Gump and wife * * * ($375) and the said Lewis Gump and wife are to pay James A. Ramsey and wife * * * ($100) for each and every well drilled on the above premises after April 1st A.D. 1922." (July 7, 1922 Deed.)

{¶46} 13.   The deed recorded August 11, 1919, shows the 91.66 acres were conveyed from Felix and Fanny Parker and Lewis and "Annie Gump" to grantees, W.H. Parker and wife.   It states, "In the event a fifteen barrel well is drilled on the within described premises and produced daily for a month, J.W. Stoneking is to pay W.H. Parker (Grantee) $187.50 and Felix Parker $187.50 and Lewis Gump $375."   This conveyance also states:  "Further, said Lewis Gump excepts and reserves 1/32 of the oil and gas and agrees to pay said Grantee W.H. Parker and wife, $100.   * * * for each and every well drilled on said premises.   Be the same more or less, but subject to all legal highways." (March 26, 1919 Deed.)   This deed lists as the individuals being sworn as Felix Parker, Fanny Parker, Lewis Gump and Anna Gump.   This deed created the Gump 1/32 reservation.   This is the only record in the chain of title containing the Lewis Gump 1/32 reservation.   It shows that "Lewis and Anna Gump husband and wife" personally appeared before a notary public in Monongalia County, West Virginia.  (August 11, 1919 Deed.)  This deed refers to Lewis' wife as Anna and Annie.

{¶47} 14.   The deed recorded May 17, 1918 shows Ernest and Mollie McGaughy granting the property to Lewis Gump and Felix Parker.   This conveyance states it was, "[f]urther excepting the 1/16 of the oil and gas; and in the event a Fifteen barrel well is drilled and produces daily, for one month; J.W. Stoneking is to pay the grantees in this deed Seven hundred and Fifty ($750) Dollars as will be better understood in the Belmont County Records, Book 197, page 206."   This deed does not contain the specific ½ gas reservation but it refers to the other document creating the Stoneking reservations.  (May 17, 1918 Deed.)

{¶48} 15.   A copy of the referenced document filed in the Belmont County Records, Book 197, page 206 shows Ernest and Mollie McGaughy conveyed to J.W. Stoneking, "(1/16) part of all the oil and one-half [1/2] gas in place in or under, or which may be produced from the following described piece or parcel of land, together with the right and privilege of the use of the land for oil and gas exploration and production which land is situated in the Township or District of Smith."   This conveyance was recorded July 8, 1914 and created the Stoneking interest consisting of 1/16 of the oil and 1/2 gas in or under the property.  (July 8, 1914 Record.)

Case No. 22 BE 0050

{¶49} 16. The next prior record filed in the chain of title was recorded March 11, 1911. This deed grants 119.66 acres "more or less" to Earnest McGauhy from Catherine McGauhy; Nelson and Emma McGauhy; Esta and Oliver Clithero; Thomas and Flora McGauhy; and Otway McGauhy. The only reservation or exception in this conveyance is the number 8 Pittsburgh vein of coal. According to Appellants, this is the first recorded conveyance for this property. (March 11, 1911 Deed.)

{¶50} The foregoing documents in the chain of title are not in dispute. However, the impact or effect of the foregoing instruments is disputed.

### First Assignment of Error: Marketable Title Act

{¶51} Appellants' first assigned error asserts:

"The trial court erred in finding that the Marketable Title Act did not extinguish the Stoneking Interest and the Gump Interest and that Appellees were entitled to summary judgment on Appellants' Marketable Title Act claim."

{¶52} Appellants' first assignment of error is comprised of two main arguments. First, Appellants contend the trial court erred as a matter of law by *not* finding the Stoneking and Gump interests were extinguished on June 2, 2012 by operation of the MTA. Appellants' claimed root of title is the June 2, 1972 deed.

{¶53} Second, Appellants contend there are no applicable exceptions preventing the MTA from extinguishing preexisting claims and interests. They claim the trial court erred by finding the 1972 deed contains a "specific reference," and as a result, preserved the Stoneking and the Gump interests.

{¶54} Minerals underlying the surface are part of the real estate. *Chesapeake Expl., L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 21. However, the minerals may be severed from the rest of the realty and have separate ownership. *Id.* "Although the surface land may be separately owned, * * * when the interests have been severed, 'neither the owner of the surface interest nor the owner of the mineral interest has full ownership' because '[e]ach has rights that are subject to the rights of the other.'" *Id.* at ¶ 23, quoting *Snyder v. Ohio Dept. of Natural Resources,* 140 Ohio St.3d 322, 2014-Ohio-3942, 18 N.E.3d 416, ¶ 13.

{¶55} The Dormant Mineral Act and the Marketable Title Act provide alternate and independent mechanisms to reunite a surface estate with its severed mineral interests.

*Peppertree Farms, L.L.C. v. Thonen*, 167 Ohio St.3d 52, 2022-Ohio-395, 188 N.E.3d 1061, ¶ 5. Courts are to liberally construe the Marketable Title Act (MTA) and the Dormant Mineral Act (DMA) to simplify and facilitate land title transactions by allowing persons to rely on a record chain of title. R.C. 5301.56.

**{¶56}** The MTA provides a "marketable record title" to an individual who has an unbroken chain of title of record *to any interest* in land for at least 40 years *to that interest*. R.C. 5301.48. With limited exceptions delineated in R.C. 5301.49, a marketable record title "operates to extinguish" all interests and claims that existed prior to the effective date of the root of title, and those preexisting interests are "null and void." R.C. 5301.47(A); R.C. 5301.50.

**{¶57}** R.C. 5301.49 identifies exceptions from extinguishment, which the Ohio Supreme Court refers to as "saving events." *Corban v. Chesapeake Exploration, L.L.C.*, 149 Ohio St.3d 512, 2016-Ohio-5796, 76 N.E.3d 1089, ¶ 18. The MTA extinguishes property interests by operation of law after 40 years from the effective date of the root of title unless a saving event has occurred. *Id.* And an interest extinguished by operation of the MTA cannot be revived. R.C. 5301.49(D).

**{¶58}** Appellants claim the trial court erred as a matter of law by finding the 1972 deed is not a proper root of title. With regard to this issue, the trial court found it was *not* a proper root of title as a matter of law based on two reasons, stating in part:

> [*First*, a] deed is "an improper root of title deed" if it contains a reservation. *Soucik v. Gulfport Energy Corp.*, 2019-Ohio-491, ¶ 58 (7th Dist.). The 1972 Deed on which Plaintiffs have based their MTA claim contains the following reservation: "ALSO EXCEPTING and reserving sixty-three sixty-fourths (63/64) of all the oil and gas in and under said premises."
>
> * * *
>
> *Second*, * * * the 1972 Deed remains an improper root because it does not "account for the interest the person is claiming to have record marketable title to." *Senterra Ltd. V. Winland*, 2019-Ohio-4387, ¶ 55 (7th Dist.), *aff'd*, 2022-Ohio-2521. Plaintiffs claim to own the entire oil and gas interest based on the 1972 Deed, but that deed contains an exception affecting the interest claimed by Plaintiffs, which makes it an improper root.

(September 9, 2022 Order p. 9-11.)

**{¶59}** Appellants claim both reasons given by the trial court for finding the 1972 deed is not a proper root of title are erroneous. We address each in turn.

**{¶60}** As for the first reason given by the trial court, Appellants claim the fact that the 1972 deed contains a repetition of a prior oil and gas interest reservation does not invalidate it as a proper root of title.

**{¶61}** Consistent with Appellants' argument and contrary to the trial court's finding, this court has held that the root of title *can* contain a reservation or exception—as long as the deed still accounts for the interest the surface owner is claiming as record marketable title. *Senterra Ltd. v. Winland*, 7th Dist. No. 18 BE 0051, 2019-Ohio-4387, 148 N.E.3d 34, ¶ 55, *modified on recon.,* 7th Dist. Belmont No. 18 BE 0051 2019-Ohio-5458, *aff'd,* 2022-Ohio-2521, and *aff'd,* 2022-Ohio-2521.

**{¶62}** Relying on the Ohio Supreme Court's decision in *Blackstone v. Moore,* 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, ¶ 9, we found "the 'root of title' can contain a repetition of a reservation; the deed must merely account for the interest the person is claiming to have record marketable title to and not be the severance deed." *Senterra Ltd., supra*; *accord McClellan v. McGary*, 7th Dist. Monroe No. 19 MO 0018, 2020-Ohio-1109, ¶ 35, *aff'd,* 163 Ohio St.3d 541, 2020-Ohio-6762, 171 N.E.3d 320.

**{¶63}** Here, it is undisputed that the 63/64 exception which is included in the 1972 deed is the repetition of a prior reservation created in 1922. Thus, to the extent the trial court held that the inclusion of a repetition of a reservation precludes the 1972 deed from being a proper root of title, it erred. *Id.*

**{¶64}** However, the trial court was correct for other reasons. Appellants' second argument about root of title challenges the trial court's finding that the 1972 deed is an improper root of title because it does not "account for the interest the person is claiming to have record marketable title to." *Senterra, Ltd. v. Winland*, -- N.E.3d.--, 2022-Ohio-2521. We agree with this aspect of its decision.

**{¶65}** Appellants assert the 1972 deed accounts for the Stoneking and the Gump interests; whereas the trial court held it must account for all of the oil and gas mineral rights or fee simple for which Appellants contend they own. Appellants also claim the trial court erred by not following the Ohio Supreme Court decision in *Senterra*, and holding

the Stoneking and the Gump interests were extinguished in light of the lack of references in the chain of title.

{¶66} The statutory definition of root of title states:

"Root of title" means that conveyance or other title transaction in the chain of title of a person, purporting to create the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined. The effective date of the "root of title" is the date on which it is recorded.

R.C. 5301.47(E).

{¶67} Notwithstanding the confusion a plain reading of R.C. 5301.47(E) invokes, this court has broken the definition down into two separate components, a substantive requirement and a temporal one, explaining:

The temporal element for a "root of title" is a title transaction that is at least 40 years preceding the date when marketability is being determined. Once that title transaction is found, it must be determined whether that title transaction meets the second element. This substantive element requires the title transaction to purport "to create the interest claimed by such person, upon which he relies as a basis for the marketability of his title." R.C. 5301.47(E). A "root of title" cannot be the initial severance deed of the interest the person is seeking to have extinguished. This is because record marketable title extinguishes interests and claims existing prior to the effective date of the root of title, not when the interest and claims were created in the "root of title." R.C. 5301.47(A).

*Senterra Ltd. v. Winland, supra,* at ¶ 53 (7th Dist.).

{¶68} Appellants claim the root of title is the 1972 deed. Appellants' claimed date of marketability is June 2, 2012, and their alleged root of title is the June 2, 1972 Survivorship Deed by which William and Mildred Britton granted to Robert and Joy Kinkade for their joint lives with remainder to the survivor 93.70 acres and excepting 10.737 acres, and thus conveying 82.963 acres. There is no dispute that June 2, 2012

Case No. 22 BE 0050

is forty years later than June 2, 1972. Thus, the temporal element for a root of title is satisfied. R.C. 5301.47(E).

**{¶69}** What is in dispute, however, is the substantive element. The substantive aspect of the root of title definition requires the title transaction to "purport[* * *] to create the interest claimed by such person, upon which he relies as a basis for the marketability of his title." R.C. 5301.47(E). Appellants claim to own the surface rights to the property and all the mineral rights underlying the property by operation of the MTA and/or the DMA.

**{¶70}** The June 1972 Survivorship Deed states in pertinent part that it was: "ALSO EXCEPTING and reserving sixty-three sixty fourths (63/64) of all the oil and gas in and under said premises." (June 2, 1972 Survivorship Deed.) Because it excepted 63/64 of the oil and gas rights, this conveyance only purports to transfer 1/64 of the oil and gas to the grantee. The alleged root of title, the 1972 deed, only purports to convey to Appellants' predecessor 1/64 (or .984375 in decimal form) of the oil and gas rights underlying the real property because it repeats the 63/64 reservation. This 63/64 reservation is also repeated in the 1998 deed, which conveyed the real property to Appellants.

**{¶71}** An individual can only convey what he or she owns. *Sharp v. Miller*, 7th Dist. No. 17 JE 0022, 2018-Ohio-4740, 114 N.E.3d 1285, ¶ 28. The record is clear that William and Mildred Britton owned 1/64 of the mineral interests at the time they conveyed the surface real estate to Robert and Joy Kinkade. Consequently, the Kinkades could only convey this same 1/64 interest to Appellants.

**{¶72}** As detailed in the chain of title section, the Stoneking interest was created in 1914 and reserved the Stoneking interest consisting of 1/16 of the oil and 1/2 of the gas in or under the property. (July 8, 1914 Record.) The deed recorded May 17, 1918 shows Ernest and Mollie McGaughy granting the property to Lewis Gump and Felix Parker. This conveyance states it was, "[f]urther excepting the 1/16 of the oil and gas * * *." (May 17, 1918 Deed.) The Stoneking exception was not repeated after 1918 in the chain of title.

**{¶73}** As for the Gump 1/32 reservation, the only title transaction in the chain of title containing the Gump reservation is the August 11, 1919 Deed creating it. (August 11, 1919 Deed.)

Case No. 22 BE 0050

{¶74} Nevertheless, the next subsequent title transaction, i.e., July 7, 1922, purports to create the Parker 63/64 interest. However, in light of the existing, viable reservations at the time, the Parkers were incapable of creating a reservation in the amount of 63/64 of the oil and gas rights underlying the property. After the 1/16 Stoneking oil interest was reserved, 15/16 (or 30/32) oil interest remained. Then the Gump reservation was 1/32 of the remainder, or 15/16 (or 30/32) minus 1/32 leaving 29/32 (or 58/64) as remainder of the oil rights.

{¶75} Further, the initial Stoneking reservation reserved a 1/2 interest in the gas rights. And after the 1/2 Stoneking gas interest, only 1/2 interest remained. From the remaining 1/2 interest or 16/32, the Gumps reserved 1/32 of the remaining half interest, leaving 15/32 of the gas or 30/64 left to be reserved by the Parkers.

{¶76} Because the alleged root of title (the 1972 deed) includes a 63/64 reservation, we conclude the 1972 deed "only purports to create" a 1/64 oil and gas mineral right in the grantee. Thus, the 1972 deed cannot be a proper root of title upon which Appellants rely as showing "record marketable title" to the Gump 1/32 reservation or the Stoneking 1/16 and 1/2 reservations because individually the Gump and the Stoneking interests are greater than 1/64. Therefore, the 1972 deed cannot be a proper root of title for either since it cannot be relied on as showing Appellants having an unbroken chain of title of record to the oil and gas interests, except for the 1/64 interest. *See Pernick v. Dallas*, 7th Dist. Jefferson No. 21 JE 0011, 2021-Ohio-4635, ¶ 45, *appeal not allowed,* 166 Ohio St.3d 1449, 2022-Ohio-994, 184 N.E.3d 159 (explaining the root of title deed conveys the entire interest absent express exceptions and reservations).

{¶77} Accordingly, the 1972 deed does not satisfy the substantive element of the root of title definition because it creates less of an interest than "the interest claimed by" Appellants. This conclusion is based on the plain language of R.C. 5301.48, the plain language of the root of title definition, and the Supreme Court's decision in *Senterra, Ltd., supra*, at ¶ 15. It is axiomatic that an individual cannot hold themselves out as the record title owner to an interest in property when the deed relied on for ownership of that interest does not on its face "purport to convey" the interest claimed to be owned. *See Senterra Ltd. v. Winland*, 7th Dist. Belmont No. 18 BE 0051, 2019-Ohio-4387, 148 N.E.3d 34, ¶ 68

(explaining a deed containing a 1/4 mineral reservation only purports to convey the remaining 3/4 interest in the oil and gas).

**{¶78}** Further, there are no other possible roots of title here that could be relied on by Appellants as conveying anything more than 1/64 of the oil and gas rights because the 63/64 reservation was created in 1922 and was repeated in the title transactions through 1998. Absent a proper root of title, the landowner has no title of record to rely on for the marketability of his title and extinguishment under the MTA does not occur. R.C. 5301.48.

**{¶79}** It is not the inclusion of the reservation that defeats Appellants' argument, but the fact the reservation explicitly contained is greater than the amount of the interest Appellants claim to own via this title transaction. Thus, we conclude the trial court erred in part by holding the root of title must purport to convey the entire property, including all surface and mineral rights. Instead, the alleged root of title must only purport to convey an amount equal to or greater than the amount they claim to own such that the purported root of title is capable of showing marketability to that portion of the property. *See Senterra, Ltd. v. Winland*, --N.E.3d--, 2022-Ohio-2521.

**{¶80}** Absent a proper root of title upon which the surface owners can rely as showing or purporting to show an unbroken chain of title of record, the MTA is inapplicable. Thus, it cannot be employed here to show Appellants' ownership of anything more than the 1/64 interest conveyed pursuant to the 1972 deed. R.C. 5301.48.

**{¶81}** Appellants' final argument under their first assigned error contends the trial court erred by holding the Parker reservation was a specific reservation and the inclusion of it in the 1972 deed precluded the extinguishment of the Gump and Stoneking interests under the MTA as well.

**{¶82}** With regard to this issue, the trial court found:

[T]he specific reference in the 1972 Deed preserves the Stoneking interest and the Gump interest [pursuant to the *Blackstone* three-part inquiry]. *See Blackstone v. Moore*, 2018-Ohio-4959.

* * *

The reference [in] the 1972 Deed is a specific reference sufficient to preserve the relevant interests. That deed reserved "sixty-three sixty-

fourths (63/64) . . . of all the oil and gas in and under said premises," and by describing the extent of the interest, the reference is not vague, boilerplate language. *See Erickson*, 2021-Ohio-746, ¶¶ 24, 32. (Emphasis sic.)

(September 9, 2022 Order p. 9-11.)

**{¶83}** Upon applying the *Blackstone* test, we agree the Parker reservation is a specific reservation.

**{¶84}** The Ohio Supreme Court in *Blackstone v. Moore*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, ¶ 12, created a three-step inquiry to determine if a reference is general or specific in order to trigger a savings event under the MTA: "(1) Is there an interest described within the chain of title? (2) If so, is the reference to that interest a 'general reference'? (3) If the answers to the first two questions are yes, does the general reference contain a specific identification of a recorded title transaction?"

**{¶85}** *Blackstone* also set forth definitions for distinguishing between general and specific references:

"General" is defined as "marked by broad overall character without being limited, modified, or checked by narrow precise considerations: concerned with main elements, major matters rather than limited details, or universals rather than particulars: approximate rather than strictly accurate." *Webster's Third New International Dictionary* 944 (2002).

* * *

"Specific" is defined as "characterized by precise formulation or accurate restriction (as in stating, describing, defining, reserving): free from such ambiguity as results from careless lack of precision or from omission of pertinent matter." *Webster's Third New International Dictionary* at 2187.

*Id.* at ¶ 13-14.

**{¶86}** The answer to the first question is yes. The 1972 deed repeats the reservation language from the July 7, 1922 deed that created it, i.e., reserving 63/64 of the oil and gas under the property. The reservation does not identify the owner by name. The reservation likewise does not contain a reference to the transaction or record number or page number where the reservation was created. Nonetheless, we find the answer to

the second question is also yes. The description is specific and uses precise figures in describing the amount of reservation, i.e., 63/64, which we find makes the reservation specific because it is characterized by a unique and accurate amount reserved, not just a vague or ambiguous statement such as "preserving all prior mineral reservations." Moreover, the reservation sufficiently describes the type of reservation created, i.e., oil and gas. *Id.* at ¶ 15. Thus, we need not proceed to the third prong of the *Blackstone* test. *Id.*

**{¶87}** Accordingly, we conclude the inclusion of the Parker interest, albeit not identified by name or record number, sufficiently specific and identified as the one reserved in favor of the Parkers, such that the interest is preserved under the MTA, not extinguished by it. R.C. 5301.49(A). Thus, we agree with this aspect of the trial court's decision.

**{¶88}** As for Appellants' remaining argument under this assigned error, we decline to reach the merits as moot. App.R. 12(A)(1)(c). As stated, there are no other possible roots of title which could be relied on by Appellants as conveying anything more than 1/64 of the oil and gas rights. Absent a proper root of title, the landowner has no title of record to rely on for the marketability of his title and extinguishment under the MTA does not occur. R.C. 5301.48.

**{¶89}** Based on the foregoing, we conclude the trial court erred in part, but its ultimate decision that the Stoneking and Gump interests were preserved and not extinguished by the MTA is affirmed.

### Second Assignment of Error:  Dormant Mineral Act

**{¶90}** Appellants' second assignment of error asserts:

"The trial court erred in finding that Appellees were entitled to summary judgment on Appellants' Dormant Mineral Act claim."

**{¶91}** Appellants first claim this assignment is moot because they should prevail on their Marketable Title Act claim and argument in their first assigned error. However, as we concluded the Stoneking and Gump interests were *not* extinguished under the MTA, we must address this argument on its merits.

**{¶92}** The General Assembly enacted the Dormant Mineral Act in 1989 as a supplement to the Ohio Marketable Title Act to provide a mechanism for reuniting

abandoned severed mineral interests with the surface estate. *Dodd v. Croskey*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 7-8. "The Marketable Title Act and the Dormant Mineral Act afford independent procedures, either of which may be used to effect the termination of a severed mineral interest, depending on the circumstances of the case and the time that has elapsed." *West v. Bode*, *supra*, at ¶ 42.

**{¶93}** Appellants raise two arguments in support of their contention that the trial court erred by *not* finding the Stoneking and Gump interests were abandoned under the Dormant Mineral Act or DMA.

**{¶94}** First, Appellants assert the Stillions are not holders as that term is defined, and thus, the trial court erred as a matter of law by finding the Stillion claim to preserve prevents abandonment via the DMA because a claim by a non-holder has no legal effect. Based on the unique facts here, we disagree, but limit our holding to the facts of this case.

**{¶95}** With regard to this issue, the trial court held, "the mineral interests have been preserved, preventing abandonment under the DMA. On October 19, 2011—the so-called Stillion Heirs filed a timely claim to preserve, which 'protects all of the mineral holders.' *Jefferis [Real Estate Oil & Gas Holdings LLC v. Shaffner Law Offices LPA*,] 2018-Ohio-3733, ¶ 15." (September 9, 2022 Order.)

**{¶96}** The statutory procedure for abandonment of a mineral right is commenced by the surface owners of the property providing notice. R.C. 5301.56(E) instructs:

> Before a mineral interest becomes vested under division (B) of this section in the owner of the surface of the lands subject to the interest, the owner of the surface of the lands subject to the interest shall do both of the following: (1) Serve notice by certified mail, return receipt requested, to each holder or each holder's successors or assignees, at the last known address of each, of the owner's intent to declare the mineral interest abandoned. * * * The notice shall contain all of the information specified in division (F) of this section.

Upon receipt of notice as described in 5301.56(E),

> the holder or the holder's successors or assignees, not later than sixty days after the date on which the notice was served or published, as applicable,

Case No. 22 BE 0050

shall file in the office of the county recorder of each county where the land that is subject to the mineral interest is located one of the following:

(a) A claim to preserve the mineral interest in accordance with division (C) of this section;

* * *

The holder or the holder's successors or assignees shall notify the person who served or published the notice under division (E) of this section of the filing under this division.

R.C. 5301.56.

{¶97} The statutory requirements for a "claim to preserve" are set forth in R.C. 5301.56(C), which states:

(1) A claim to preserve a mineral interest from being deemed abandoned under division (B) of this section may be filed for record *by its holder*. Subject to division (C)(3) of this section, the claim shall be recorded in accordance with division (H) of this section and sections 317.18 to 317.20 and 5301.52 of the Revised Code, and shall consist of a notice that does all of the following:

(a) States the nature of the mineral interest *claimed* and any recording information upon which the claim is based;

(b) Otherwise complies with section 5301.52 of the Revised Code;

(c) States that *the holder* does not intend to abandon, but instead to preserve, the holder's rights in the mineral interest.

(Emphasis added.)

Under R.C. 5301.52(A) a claim to preserve must: 1) be in the form of an affidavit; 2) state the nature of the claim to be preserved along with the names and addresses of the people for whose benefit the notice is being filed; 3) contain an accurate and full description of all land affected by the notice; 4) state the name of each record owner of the land affected by the notice, at the time of the recording, together with the recording information of the instrument by which each record owner acquired title to the land; and 5) be made by any person who has knowledge of the relevant facts.

*Hutchins v. Baker*, 7th Dist. Monroe No. 19 MO 0005, 2020-Ohio-1108, 153 N.E.3d 140, ¶ 29. And R.C. 5301.52(C) states: "A notice prepared, executed, and recorded in conformity with the requirements of this section, or a certified copy of it, shall be accepted as evidence of the facts stated *insofar as they affect title to the land affected by that notice.*" (Emphasis added.)

> A claim that meets these requirements preserves the rights of all of the mineral-interest holders in the land. R.C. 5301.56(C)(2).
>
> If the mineral-interest holder fails to comply with either of the alternative requirements of R.C. 5301.56(H)(1) by filing a claim to preserve or an affidavit identifying a saving event, the surface owner must file a notice of failure to file pursuant to the statutory requirements. R.C. 5301.56(H)(2). After this notice is recorded, the mineral interest "shall vest in the owner of the surface of the lands." *Id.*

*Dodd v. Croskey*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 28-29.

**{¶98}** The parties agree that a claim to preserve filed by one holder of mineral interests, in response to a notice of abandonment via publication, preserves the interests of others under the DMA. *Warner v. Palmer*, 7th Dist. Belmont No. 14 BE 0038, 2017-Ohio-1080, ¶ 21. However, because the Stillions were ultimately determined not to constitute as holders, as that term is defined, the parties disagree about whether their claim to preserve has any affect.

**{¶99}** Appellants argue the Stillions' claim to preserve was of no legal consequence and did not act to preserve the interests of the actual holders of interests underlying Appellants' property. Appellees, on the other hand, urge affirmance of the trial court's decision in light of the facts here. They contend a claim to preserve that preserves the interests of all holders of an interest need not be recorded by an actual and undisputed holder of mineral interests. Instead, Appellees contend the statute requires the notice include the potential holder's attestation that they own an interest in the property, and because the statutory requirements were satisfied here, preservation of the other owners' rights occurred. R.C. 5301.52.

**{¶100}** In support of their contention that the Stillion heirs were <u>not</u> holders of a mineral interest underlying the property, Appellants again rely on their settlement

agreement in a prior Belmont County Court of Common Pleas case, 2012 CV 458, which states in part: "Ray Lloyd Beck, Clarence Wallace and Karen Greenlee are not successors and assigns as required by the act; and therefore, they do no hold an interest in the oil, gas and other minerals underlying the subject real estate." (December 18, 2012 Settlement Agreement & Judgment Entry.) Because these individuals (Beck, Wallace and Greenlee) were signatories to this 2012 agreed entry, Appellants claim this is conclusive evidence that these individuals are <u>not</u> holders. We disagree since this is not Civ.R. 56 compliant evidence. Had Appellants wanted to establish this fact in evidence for the court to consider in this case, Appellants were required to offer it in evidentiary form in compliance with Civ.R. 56.

{¶101} The inclusion of a stipulated fact in a settlement agreement ending litigation does not make it a conclusive fact in subsequent litigation involving different parties. Parties to litigation often enter settlement agreements in which one party agrees to pay the other money for the dismissal of a civil lawsuit and both parties usually stipulate to certain things in writing. For example, a plaintiff may agree the defendant was not negligent or not in breach of contract and agree to dismiss his lawsuit in exchange for the payment of money. This is the nature of a settlement agreement, but it does not make the facts therein conclusive against nonparties.

{¶102} Civ.R. 56(C) instructs a court to only consider "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action" when ruling on a motion for summary judgment.

> "The proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56(C) is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56(E)." *Biskupich v. Westbay Manor Nursing Home* (1986), 33 Ohio App.3d 220, 222, 515 N.E.2d 632. "The requirement of Civ.R. 56(E) that sworn or certified copies of all papers referred to in the affidavit be attached is satisfied by attaching the papers to the affidavit, coupled with a statement therein that such copies are true copies and reproductions." *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 467, 20 O.O.3d 388, 423 N.E.2d 105. The referenced

papers may also be "sworn or certified" by a certification contained within the paper itself. *Olverson v. Butler* (1975), 45 Ohio App.2d 9, 12, 74 O.O.2d 11, 340 N.E.2d 436. Finally, it is well settled that unauthenticated documents which are not sworn, certified, or authenticated by way of affidavit have no evidentiary value and may not be considered by the trial court in ruling on a motion for summary judgment. *Citizens Ins. Co. v. Burkes* (1978), 56 Ohio App.2d 88, 95–96, 10 O.O.3d 119, 381 N.E.2d 963; *Sparks v. Erie Cty. Bd. of Commrs.* (Jan. 16, 1998), 6th Dist. No. E-097-007, 1998 WL 15929.

*Douglass v. Salem Community Hosp.*, 153 Ohio App.3d 350, 2003-Ohio-4006, 794 N.E.2d 107, ¶ 25 (7th Dist).

**{¶103}** Thus, regardless of the agreed upon facts in the settlement entry, it is not summary judgment compliant evidence. *Id.*; Civ.R. 56. Furthermore, and as stated, a settlement agreement or judgment issued in a different case is not binding in subsequent litigation involving different parties. *See Henderson v. Haverfield*, 7th Dist. Harrison No. 21 HA 0005, 2022-Ohio-2194, ¶ 79.

**{¶104}** Here, the Stillion notice to preserve states it is a notice to preserve oil and gas rights. It states the heirs of Charles Russell Stillion, who are listed, are "the owners of reserve oil and gas rights located in Smith Township * * * as set forth in Belmont County Record Volume 436, Page 226, Belmont County Deed Records, * * * attached * * * as Exhibit A." It also states they intend to preserve their interest in the oil and gas. The affidavit lists the Appellants as the surface owners of the real estate "as recorded in Volume 740, Page 319, Belmont County Official Records." The affidavit is signed by the Stillion heirs' attorney and was notarized October 18, 2011. Attached is a description of real estate described in part as "a part of Section 13, Township 6, Range 4." (September 21, 2020 EQT Motion for Summary Judgment, Exhibit I.)

**{¶105}** We agree with Appellees and the trial court. The claim to preserve in this case operated to preserve the interests of the actual holders under R.C. 5301.56(C).

**{¶106}** "'Holder' means the record holder of a mineral interest, and any person who derives the person's rights from, or has a common source with, the record holder and whose claim does not indicate, expressly or by clear implication, that it is adverse to

the interest of the record holder." R.C. 5301.56(1). This court has stated the term holder is a broad term and "includes those who may derive rights from the record holder 'either by testate or intestate succession.'" *Warner v. Palmer*, 7th Dist. Belmont No. 18 BE 0012, 2019-Ohio-4078, ¶ 20, quoting *M & H Partnership v. Hines*, 7th Dist. Harrison No. 14 HA 004, 2017-Ohio-923, ¶ 19. Yet, neither this court nor the Ohio Supreme Court has addressed the issue presented.

{¶107} Appellants attached the affidavit of Suzanne Perks, one of the named Appellants, dated May of 2019, to their motion for summary judgment. Perks states in her affidavit she began the DMA process with another individual's notice of abandonment regarding an approximate 10-acre parcel that had been severed from the parcel she jointly owns with the other Appellants. Perks avers in part:

> That I was able to locate addresses for and serve the majority of the Stillion children with Certified Letters relaying our intent to Claim the Mineral Rights Abandoned on tax parcel 36-00386.000.
>
> * * *
>
> That the Stillion heirs filed a Notice to Preserve the Stillion mineral interest with the Belmont County Recorder's Office dated October 18, 2011 * * *. That the Stillion heirs did not provide notification to me or any of the co-filers of the Notice of Abandonment, that they had filed a notice to preserve the oil and gas interest as is required per section H of the ORC 5301.56 * * *.
>
> That we were not aware that the Stillion heirs had filed a Notice to Preserve * * * when we reviewed the county records in November of 2011.
>
> That on November 23rd 2011 we, the surface owners, having received no Notice of Claims * * *, recorded the Affidavit of Abandonment * * *.
>
> That upon review of the Belmont County Recorder's records in January 2012, we became aware of the Notice to Preserve filed by * * * the Stillion heirs.
>
> * * *

That Attorney Todd Kildow can provide an account of his actions as it relates to his discovery via a title search at the Belmont Recorders Office that Thomas and Vera Stillion were not holders of a mineral interest in the property.

(July 16, 2020 Motion for Summary Judgment, Ex. 5, Perks Affidavit.)

**{¶108}** According to Perks' affidavit, she again served the Stillion heirs via notice by publication on September 29, 2011—after their notice of preservation was recorded on October 19, 2011. Perks stated she was unaware of their notice to preserve at the time. (Perks Affidavit.)

**{¶109}** Appellants also attached the affidavit of their attorney, Todd M. Kildow, to their motion for summary judgment. He states in part he was retained by Appellants after Perks completed the notice of abandonment procedure. He verified the steps she had taken and averred in part:

20. The Notice of Abandonment * * * was successful because there were no legitimate claims filed after the filing of the Affidavit of Abandonment filed for record * * * on November 23, 2011.

21. The Notice of Abandonment served and published by Suzanne Perks included Thomas A. Stillion, Vera V. Stillion, Audrey Stillion, Marlene K. Crum, [et al.], as persons that may be holders as a result of the repeat reservation set forth in Deed Book 436, at page 226, filed for record on May 9, 1957 * * *.

22. Each of the persons listed in the previous paragraph 21 were listed in error as they were not holders because the repeat reservation in DB 436, Page 226 did not reserve any oil and gas. The deed just prior to DB 436, Page 226 was Deed Book 419, Page 587, a certified copy of which is attached hereto as Exhibit 3.

(July 16, 2020 Motion for Summary Judgment, Ex. D, Kildow Affidavit.)

**{¶110}** Exhibit 3 attached to Kildow's affidavit is the July 14, 1954 warranty deed that conveys the property from Herman and Garneda Bartolomucci to Thomas and Vera Stillion. This deed repeats the 63/64 Parker reservation. The next deed or title transaction is the May 10, 1957 warranty deed. It does not appear to reserve any oil or

Case No. 22 BE 0050

gas rights in favor of the Stillions upon their conveyance of the surface rights to William and Mildred Britton. This 1957 deed also repeats the 63/64 Parker reservation. (May 10, 1957 Warranty Deed.) Thus, we agree the Stillion heirs are not holders of oil and/or gas interests underlying Appellants' property.

{¶111} However, Appellants served the Stillion heirs with notice by certified mail that they were potential owners of mineral rights underlying the property. Appellants also included the Stillion heirs as potential holders of mineral rights via their notice of publication in the local newspaper dated September 29, 2011. In response, the Stillions filed a notice to preserve their potential interest generally complying with the statutory requirements.[3]

{¶112} The claim to preserve is in the form of an affidavit; states the mineral interests claimed; lists the recording information upon which the claim is based; lists the names of the persons for whose benefit the notice is being filed and their attorney's address and contact information; contains a description of the land affected by the claim; states the name of each record owner of the land affected by the notice and that Appellants are the current record owners of the land; is executed by a person who had knowledge of the relevant facts; and states the Stillion heirs do not intend to abandon said interests.

{¶113} Further, the claim to preserve was filed in the county recorder's office. R.C. 5301.56(H)(1). The Stillion heirs filed their claims within sixty (60) days from the date the notice was published; here, they filed their claim to preserve before the surface owners published the notice. R.C. 5301.56(H)(1). Because the claim to preserve was in response to Appellants' notice and complies with R.C. 5301.56(C) and R.C. 5301.56(H), it operates to preserve the rights of all the mineral-interest holders in the land per the statute. *See Wendt v. Dickerson*, 5th Dist. Tuscarawas No. 2017 AP 08 0024, 2018-Ohio-1034, 108 N.E.3d 1174, ¶ 52.

---

[3] We note the Stillion notice to preserve does not indicate whether it was served on the surface owners, and Perks states in her affidavit that it was not served on Appellants. However, Appellants did not challenge the notice to preserve on this basis, and as such, this argument is waived. *M & H Partnership v. Hines*, 7th Dist. No. Harrison 14 HA 0004, 2017-Ohio-923, 86 N.E.3d 780, ¶ 25.

Case No. 22 BE 0050

{¶114} There is no requirement in R.C. 5301.52 that the claim to preserve be filed by an undisputed and actual holder. Instead, the statute requires the claim be filed by one who attests to their ownership of an interest in the property under oath. Although the Stillion heirs were not actual holders of an interest in the property, it is reasonable to conclude Appellants' act of naming them as such, plus the Stillions' subsequent claim to preserve, should operate as an effective claim to preserve under R.C. 5301.56.

{¶115} The Ohio Supreme Court explained the purpose of the claim to preserve as: "Allowing a claim preserving a mineral interest to be filed after the surface owner's notice furthers the legislative purpose because a claim to preserve describes an identifiable mineral-interest holder who presents a chain of title from which that holder claims interest in the mineral rights." *Dodd v. Croskey*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 36. In a footnote to that same sentence, the Supreme Court also opined:

> Presumably, the surface owner can challenge the accuracy of the mineral-interest holder's claim. But that is outside the operation of the Dormant Mineral Act, which addresses only whether a surface owner can employ the act's provisions to deem the mineral rights abandoned, reunite the mineral rights with the surface rights, and vest them in the surface owner.

*Id.* at fn 4.

{¶116} A "claim" is defined as: "1. A statement that something yet to be proved is true <claims of torture>. 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional <the spouse's claim to half of the lottery winnings>." *Black's Law Dictionary* (11th ed. 2019).

{¶117} The legislature's repeated use of the word "claim" in the statute, coupled with the fact that Appellants notified the Stillion heirs via certified mail that they were holders, heirs, and/or owners of mineral rights underlying the property, leads us to conclude their claim to preserve did just that—preserved the mineral rights of all holders. R.C. 5301.56(C)(1).

{¶118} As surface owners seeking to employ the DMA, Appellants had the obligation, in part, to: "[s]erve notice by certified mail, return receipt requested, to each holder or each holder's successors or assignees, at the last known address of each, of

the owner's intent to declare the mineral interest abandoned. * * *." R.C. 5301.56. While Appellants likely did not *intend* to erroneously serve and name non-holders, they did. Consequently, the corresponding claim to preserve by these potential holders should not result in any different result than had the Stillions been actual holders. This result is reasonable in light of the unique facts here and the statutory directive that a claim to preserve filed by one operates to preserve the interests of all. Thus, this court agrees with the trial court.

**{¶119}** Consequently, we affirm the trial court's decision on this basis and do not address Appellants' second argument under their second assignment of error as it is moot. *Warner v. Palmer*, 7th Dist. Belmont No. 18 BE 0012, 2019-Ohio-4078, ¶ 28; *Shelko v. Dolinar*, 11th Dist. Lake No. 88-L-13-161, 1990 WL 93127, *5 (June 29, 1993) (Ford, J., dissenting) (defining moot as having no practical effect on the existing controversy); App.R. 12(A)(1)(c). Appellants' second assignment of error lacks merit and is overruled.

### Third Assignment of Error:  Breach of Contract

**{¶120}** Appellants' third assigned error contends:

"The trial court erred in finding that Appellees Rice Drilling D LLC, EQT Production Company, and Gulfport Energy Corporation did not breach Appellants' oil and gas lease by failing to make any oil and gas royalty payments."

**{¶121}** Appellants claim that because Appellees Rice, EQT, and Gulfport do not dispute their ownership of *some* oil and gas interests underlying the property, i.e., the non-severed oil and gas interest transferred to them in 1998 with the surface estate, the Parker interest, and the oil and gas interests Appellants acquired from defaulting defendants in this lawsuit, Appellees were required to pay them for these undisputed interests under their lease agreement. Appellants claim this is not the case where all of the interests are in dispute such that nonpayment would make sense. Instead, the lease payments which they demanded during the pendency of this case involve different interests other than those in dispute here. Thus, they seek payment of the royalties plus interest.

**{¶122}** Regarding this issue, the trial court held:

*First*, Plaintiffs cannot pursue this claim because they did not comply with the notice and cure provision of the lease.  Under the lease, Plaintiffs could not bring a breach of contract claim until after they provided written notice of the breach and Defendants failed or refused to satisfy the demand within at least sixty days.  Although Plaintiffs sent a letter to EQT in July 2018 about unpaid royalties, that letter focused on statutory forfeiture and only provided thirty days for compliance, so it did not constitute notice complying with the lease.

*Second*, * * * Plaintiffs claim that they are owed 100% of royalties under their lease with EQT.  EQT agreed to pay royalties proportionate to the interest owned by Plaintiffs.  Plaintiffs do not own 100% of the mineral interest because, as explained earlier, the Stoneking interest and the Gump interest remain intact.  As a result, nonpayment of 100% of royalties related to the oil and gas interest in the subject property does not amount to a breach of the lease.

Additionally, under their lease with EQT, Plaintiffs agreed that any payments would only be "paid in the proportion that Lessor's interest in the Leased Premises bears to the entire undivided fee simple estate" and that "[a]ny monies paid to Lessor under the terms of this Lease are nonrefundable."  In other words, Plaintiffs agree that, if they did not own 100% of the mineral interest, they would not be entitled to 100% of royalties, which undermines their breach of contract * * * claim * * *.

As a practical matter, because the legal landscape surrounding the MTA and DMA called the extent of Plaintiffs' ownership into question, Defendants properly suspended royalties because they would not be able to recover any amounts incorrectly paid.

(Emphasis sic.) (September 9, 2022 Order.)

{¶123}  "In a breach of contract claim, the plaintiff must prove the existence of a contract, the plaintiff's performance under the contract, the defendant's breach, and damages."  *Meeker R & D, Inc. v. Evenflo Co.,* 2016-Ohio-2688, 52 N.E.3d 1207, ¶ 41, citing *Doner v. Snapp,* 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994).

Oil and gas leases are contracts, and therefore, " '(t)he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument.' " *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9, quoting *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897). "It is a well-known and established principle of contract interpretation that '(c)ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.' " *Lutz* at ¶ 9, quoting *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus.

*Carpenter v. Antero Resources Appalachian Corp.*, 7th Dist. Monroe No. 21 MO 0007, 2022-Ohio-4619, ¶ 29.

{¶124} A review of the lease agreement dated November 8, 2012 and attached to Appellants' complaint as Exhibit F confirms that Appellants as lessors of the oil, gas, and mineral interests underlying the 74.44 acre parcel agreed to lease the premises in exchange for Appellees paying them a "proportionate share" of the "royalties, rentals, and payments." It states: "Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee * * * for all of the leased products produced * * *." (November 8, 2012, Paid Up Oil and Gas Lease.)

{¶125} Moreover, as noted by the trial court, Article XIV states in part: "This lease shall not be subject to civil action or other proceeding to enforce a claim of default or forfeiture due to Lessee's alleged failure to perform herein, unless Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy Lessor's demand within sixty (60) days from receipt of the notice * * *." (November 8, 2012, Paid Up Oil and Gas Lease.)

{¶126} As detailed under Appellants' first and second assignments of error, the parties and the court have significant and legitimate disagreements about the extent of Appellant's proportionate share of the oil and gas underlying the real property. Moreover, Appellants claim in their complaint and throughout the litigation that they are owed 100 percent of all royalties related to their surface estate. Thereafter, during the pendency of the case, Appellants moved for a court order directing these Appellees/Defendants to pay

the royalties associated with the portion of the oil and gas rights that are not in dispute, including the Parker interest and those interests corresponding with the defaulting parties herein.

**{¶127}** We disagree with Appellants' arguments. In light of the protracted litigation and the legitimacy of the arguments surrounding the ownership of the oil and gas underlying this property, in addition to the extensive caselaw that has changed and developed since the beginning of this lawsuit, we cannot find Appellees breached for their failure to pay royalties during the pendency of this litigation.

**{¶128}** Appellees do not claim they are not a party to the contract; they do not deny certain royalty payments were due and owed; they, like the rest of the litigants, simply disagree as to what Appellants' proportionate share is. And in light of the contractual provision stating that royalty payments made are not recoverable once paid, it seems Appellees had no choice but to cease payments. Appellees could not pay royalties corresponding with Appellants' proportionate share when the amount of their share was undetermined.

**{¶129}** To the extent Appellants were and are entitled to payment under their lease agreements, they should receive the compensation corresponding with their proportionate shares due. Additionally, because Appellants are likely owed money under the parties' contract, not damages for breach or violation of the contract, they may be entitled to be made whole by prejudgment interest under R.C. 1343.03(A) associated with any amount due or owed to them. *See Wasserman v. The Home Corp.*, 8th Dist. Cuyahoga No. 90915, 2008-Ohio-5477, ¶ 8-10. "[P]rejudgment interest acts as compensation and serves ultimately to make the aggrieved party whole." *Id.* citing *Royal Electric,* 73 Ohio St.3d 110, 117, 652 N.E.2d 687 (1995).

**{¶130}** Appellants' third assigned error is overruled since there was no breach of contract.

## Conclusion

**{¶131}** Based on the foregoing, we affirm the trial court's decision granting summary judgment in Appellees' favor on all claims.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 22 BE 0050

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**